**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ALLEN LUSMAT,
    *Plaintiff*,

    v.                       No. 3:20-cv-01386 (JAM)

D. PAPOOSHA *et al.*,
    *Defendants*.

**INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Allen Lusmat is a pretrial detainee who is currently in the custody of the Connecticut Department of Corrections ("DOC").[1] He filed this action *pro se* and *in forma pauperis* under 42 U.S.C. §§ 1983, 1985, and 1986 against numerous DOC officials. The claims arise from Lusmat's confinement in three different prison facilities during different periods from December 2015 to July 2020. For the reasons set forth below, I will allow some of his claims to proceed.

**BACKGROUND**

Lusmat names the following defendants in his amended complaint: Security Risk Group ("SRG") Coordinators D. Papoosha, John Aldi, and White; Director of Security A. Santiago; Offender Classification and Population Management Director ("OCPM Director") Dave Maiga; Wardens R. Bowles, G. Mudano, Mulligan, and John Doe #1; Deputy Warden K. Jones; Captains Chevalier, Kenny, and Salius; Lieutenant Medina; Correctional Officers Laprey, M. Worilds, Major, Sciascia, Hermanowski, Baez, and John Doe #2; Correctional Counselor

---

[1] The State of Connecticut Department of Correction website reflects Lusmat's latest admission date as April 11, 2019 and that he has not been convicted or sentenced. *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=371043http://www.ctinmateinfo.state.ct.us/details upv.asp?id_inmt_num=371043

Supervisor E. Tugie; and Correctional Counselor R. Riccio.[2] He seeks damages and declaratory and injunctive relief.[3]

The following facts are alleged in Lusmat's amended complaint and public filings and are accepted as true for purposes of initial review only.

The DOC has a SRG program that allows for prisoners who are suspected of certain gang affiliations to be placed in more restrictive conditions of confinement. An administrative directive issued by the DOC specifies the procedures for designation of a prisoner to the SRG program and the requirements for a prisoner to progress through five phases of the program before his return to the general population.[4]

Lusmat was arrested in August 2015.[5] In December 2015 as a pretrial detainee, Lusmat pleaded guilty to a disciplinary report issued by SRG Coordinators White and Papoosha charging him with SRG affiliation.[6] The evidence in support of the disciplinary charge included: the existence of photographs and information that had been posted on Lusmat's Facebook page prior to his confinement in prison, gang-related terms used by Lusmat during a telephone conversation made from prison, and information supplied by another inmate regarding Lusmat's involvement in "repping a gang" in the housing unit in which he was confined.[7] Prison officials imposed unspecified sanctions against Lusmat based on the guilty plea.[8]

---

[2] *See* Doc. #13 at 2-4.
[3] *Id.* at 16-17 (¶¶ 1-4, 6).
[4] *See* Connecticut State Department of Correction, Administrative Directive 6.14 (Security Risk Groups), *available at* https://portal.ct.gov/DOC/AD/AD-Chapter-6.
[5] *See State v. Lusmat*, Docket No. F02B-CR15-0286030-S (Conn. Super. Ct. Aug. 20, 2015).
[6] Doc. 13 at 7 (¶ 20).
[7] *Ibid.* (¶¶ 20-23).
[8] *Ibid.* (¶ 22).

On May 3, 2016, a Connecticut state court sentenced Lusmat to a term of imprisonment.[9] Lusmat completed the SRG program in December 2017.[10]

On April 4, 2018, at Garner Correctional Institution ("Garner"), Lusmat made a telephone call to a relative and talked about a reunion that he planned to attend after his release from prison in August 2018.[11] On April 5, 2018, Correctional Officer Major issued Lusmat a disciplinary report for SRG affiliation based on statements made by Lusmat during the telephone call and placed Lusmat in a cell in the segregation unit.[12] Captain Kenny stated to Lusmat, "I told you I would get you."[13]

On April 6, 2018, Correctional Officer Sciascia, who was investigating the disciplinary charge, informed Lusmat that prison officials considered his reference in the phone call to a reunion for "Fa-Lows day" to be an indication that he identified with a gang.[14] Lusmat responded that he was not guilty of the charge and explained that he had in fact stated that he "could not be there for Lo Day" because he would still be in prison but would make it to the reunion to be held in September 2018.[15] Lusmat further explained that "Lo Day" was a celebration to honor an activist nicknamed Lo who had died on the 4th of May.[16] Officer Sciascia suggested that Lusmat would be unsuccessful if he challenged the disciplinary report at a hearing and subsequently recommended, without performing much of an investigation, that the hearing officer find Lusmat guilty because Lusmat's telephone conversation of April 4, 2018 had

---

[9] *See State v. Lusmat*, Docket No. F02B-CR15-0286030, *available at* https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=f93b2787-9f38-410f-b7d7-555dcd85fcf5 (Last visited on July 7, 2021).
[10] Doc. #13 at 7 (¶ 20).
[11] *Id.* at 5 (¶ 1).
[12] *Ibid.* (¶¶ 2-3).
[13] *Ibid.* (¶ 2).
[14] *Ibid.* (¶ 3).
[15] *Ibid.*

included a discussion about his attendance at an anniversary party for 52 Pueblo Bishop Bloods to be held the following month.[17]

On April 12, 2018, Correctional Officer John Doe #2 submitted supplemental information to the hearing officer pertaining to his review of Lusmat's telephone conversation of April 4, 2018.[18] Officer John Doe #2 indicated that Lusmat had discussed an anniversary party for the 52 Pueblo Bishop Bloods that he was planning to attend after his discharge from prison in August 2018.[19] SRG Coordinator Aldi completed an SRG Hearing Notification to the Security Division form indicating that "Fa-Low day" could possibly have been a reference to a reunion to be held on May 2, 2018 at the Pueblo Del Rio Housing Projects and recommended that Lusmat be placed in phase one of the SRG phase program.[20]

Lusmat did not receive copies of any documents or a transcript of the telephone conversation prior to or during the disciplinary hearing.[21] At the conclusion of the disciplinary hearing, the hearing officer found Lusmat guilty of the charge and sanctioned him to twenty days of punitive segregation and fifteen days loss of Risk Reduction Earned Credits ("RREC") and imposed the following penalties: ninety days loss of telephone privileges and ninety days loss of commissary privileges.[22] While in punitive segregation, Lusmat was forced to use a "sponge on a stick" in lieu of a toothbrush.[23]

---

[16] *Ibid.* (¶ 4).
[17] *Ibid.* (¶¶ 3, 5, 7).
[18] *Ibid.* (¶ 7).
[19] *Ibid.*
[20] *Id.* at 5-6 (¶ 8).
[21] *Id.* at 5 (¶ 6).
[22] *Id.* at 6 (¶ 9).
[23] *Ibid.*

On April 19, 2018, prison officials redesignated Lusmat as a member of an SRG.[24] Warden John Doe #1 agreed that the disciplinary charge had been properly investigated and approved Lusmat's redesignation as a SRG member.[25]

On August 17, 2018, Lusmat completed his three-year sentence of imprisonment and prison officials released him from custody.[26] At the time of his release, Lusmat was participating in phase 2 of the SRG program in the Walker Building at MacDougall-Walker Correctional Institution ("Walker").[27]

In November 2018, prison officials readmitted Lusmat to Bridgeport Correctional Center.[28] At some point that month, prison officials transferred Lusmat to phase one of the SRG program at Northern Correctional Institution ("Northern").[29] Lusmat did not receive a disciplinary report and was not involved in an "incident" prior to his transfer to Northern.[30] On December 17, 2018, Lusmat posted bond and prison officials discharged him from custody.[31]

On April 11, 2019, prison officials readmitted Lusmat to New Haven Correctional Center as a pretrial detainee.[32] On April 17, 2019, Director of Security Santiago directed prison officials to transfer Lusmat, then a pretrial detainee, to Northern to be placed in phase one of the SRG program.[33] At that time, G. Mudano was the warden at Northern.[34] Lusmat did not receive a

---

[24] *Ibid.* (¶ 11).
[25] *Ibid.*
[26] *Ibid.* (¶ 12).
[27] *Ibid.*
[28] *Ibid.* (¶ 13).
[29] *Ibid.* (¶ 14).
[30] *Ibid.*
[31] *Ibid.* (¶ 15).
[32] *Ibid.* (¶ 16).
[33] *Id.* at 6, 13 (¶¶ 17, 71).
[34] *Id.* at 6 (¶ 17).

disciplinary report and was not involved in an "incident" prior to his transfer to Northern.[35]

SRG members who do not complete all five phases of the SRG program prior to discharge are usually placed in phase two or three upon readmission to the Department of Correction.[36] Although SRG Coordinator Papoosha sent Lusmat a letter regarding a review that allegedly occurred on April 12, 2019, but Lusmat did not participate in the review.[37] Nor did Papoosha provide Lusmat with an opportunity to present his views at a hearing or at any other proceeding prior to or after his transfer to Northern and placement in phase one of the SRG program.[38]

In April 2019, Lusmat drafted letters to outside organizations and his family and friends about the oppressive nature of the SRG program but prison officials did not mail the letters.[39] Lusmat was subsequently able to mail letters to outside organizations, his friends, and his family by going through the "chain of command."[40]

On May 10, 2019, Lusmat received a disciplinary report that included two different offenses.[41] Lusmat conceded that he was guilty of one of the two offenses.[42] One of the offenses stemmed from a telephone call or multiple telephone calls made by Lusmat during which he referenced a "training day" photograph on his Facebook page that depicted him with an individual identified as a member of the Athens Park Bloods.[43] Lusmat pleaded guilty to both

---

[35] *Ibid.*
[36] *Ibid.* (¶ 18).
[37] *Id.* at 7, 11 (¶¶ 25, 52).
[38] *Ibid.* at 7 (¶ 25).
[39] *Ibid.* (¶ 101).
[40] *Ibid.*
[41] *Ibid.* (¶ 26).
[42] *Ibid.*
[43] *Id.* at 7-8 (¶ 26).

6

offenses included in the disciplinary report because he did not want to be sanctioned to loss of telephone privileges.[44]

During the next four months, SRG Coordinator Papoosha restricted Lusmat from making telephone calls to or receiving telephone calls from his significant other's telephone number because the number had been mentioned in the disciplinary report issued to Lusmat on May 10, 2019.[45] SRG Coordinator Papoosha indefinitely restricted Lusmat from making telephone calls to or receiving telephone calls from two other telephone numbers that had been mentioned in the same disciplinary report.[46] Lusmat was unable to post bond due to his restricted access to these three telephone numbers and the fact that he was limited to three social telephone calls per week as a participant in phase one of the SRG program.[47] Although Papoosha appealed to Warden Mudano, the warden took no steps to alleviate the restrictions imposed by SRG Coordinator Papoosha.[48]

On May 21, 2019, SRG Coordinators Papoosha and White informed Lusmat that he had been placed in phase one of the SRG program because of a video and photographs posted on his Facebook page that depicted him at a reunion in California.[49]

As of October 2019, Lusmat had progressed to phase two of the SRG program and was confined at Walker.[50] On October 15, 2019, over thirty inmates in Lusmat's housing unit were yelling.[51] SRG Coordinator Papoosha was on the telephone with Captain Stanley at the time the

---

[44] *Ibid.*
[45] *Id.* at 8 (¶ 27).
[46] *Ibid.*
[47] *Ibid.* (¶ 28).
[48] *Ibid.* (¶ 27).
[49] *Id.* at 7 (¶ 19).
[50] *Id.* at 9 (¶ 31).
[51] *Ibid.*

yelling occurred and directed Captain Stanley to issue Lusmat a disciplinary report for yelling.[52] No other inmate received a disciplinary report.[53] Warden Mulligan placed Lusmat in solitary confinement as punishment.[54] Lusmat pleaded guilty to the disciplinary charge because he did not want to stay in solitary confinement.[55] He was unaware that pleading guilty to the charge would result in his regression back to phase one of the SRG program.[56]

On June 27, 2019, Warden Mudano denied Lusmat's request to get married because he was still in the SRG program.[57] On November 12, 2019, Captain Chevalier informed Lusmat that an inmate or detainee was not eligible to get married unless he or she was not in the SRG program and had not received a disciplinary report in a year.[58]

During Lusmat's confinement in phases one and two of the SRG program, Lusmat was subjected to many restrictive conditions, including: confinement in his cell for 23 hours a day on weekdays and 24 hours a day on weekend days, five hours of outside recreation a week in handcuffs behind the back regardless of the weather, three showers a week in an unsanitary shower stall, no more than three telephone calls a week to immediate family members and friends, and a spending limit of $25.00 per visit to the commissary.[59] Lusmat had no access to a television, a cd player, a hot pot, nail clippers, holiday packages, congregate religious services, contact visits with family or non-family members, non-contact visits with friends, educational programming, social programming, counseling, or therapy and endured being hand-cuffed and

---

[52] *Ibid.* (¶¶ 31-32).
[53] *Ibid.* (¶ 31).
[54] *Ibid.* (¶ 33).
[55] *Ibid.*
[56] *Ibid.*
[57] *Ibid.* (¶ 29).
[58] *Ibid.*
[59] *Id.* at 11-12 (¶¶ 55-56, 60-62).

8

strip-searched every time he left his cell.[60] Lusmat could earn privileges if he remained ticket-free for six months.[61] To complete all five phases of the program, Lusmat was required to remain ticket-free for two years.[62] The conditions in phase one of the program caused Lusmat to experience psychological harm, stress, depression, and misery.[63]

On July 16, 2019, a correctional officer refused to loosen Lusmat's handcuffs before he participated in recreation.[64] By the end of the recreation period, Lusmat's wrists were bleeding.[65] A medical staff member examined and took photographs of Lusmat's wrists and completed an incident report.[66] Lusmat did not receive a follow-up medical evaluation.[67]

On January 24, 2020, Correctional Officer Laprey at Northern issued Lusmat a disciplinary report based on information that he had overheard during a telephone call made by Lusmat.[68] During the call, Lusmat allegedly orchestrated a hit on an inmate at another prison.[69] Because Lusmat would not plead guilty and chose to challenge the charge at a hearing, he remained in segregation for fifteen days until a prison official dismissed the charge.[70] Officer Laprey informed Lusmat that he and SRG Coordinator Papoosha issued him the disciplinary report because they were aware that he disliked going to segregation and would usually plead guilty to a disciplinary report to avoid being placed in segregation.[71] Despite the dismissal of the disciplinary report, Papoosha restricted Lusmat's access to the telephone number that he had

---

[60] *Id.* at 12-13 (¶¶ 61, 63-64, 69-70).
[61] *Id.* at 12 (¶ 65).
[62] *Ibid.*
[63] *Ibid.* (¶ 66).
[64] *Id.* at 11 (¶ 57).
[65] *Ibid.*
[66] *Ibid.*
[67] *Id.*
[68] *Ibid.* (¶ 34).
[69] *Ibid.*
[70] *Ibid.*

called to set up the alleged hit on another inmate.[72] Lusmat's confinement in administrative

segregation for fifteen days caused him distress and hardship.[73]

In February 2020, Lusmat became eligible to progress to phase two of the SRG

program.[74] On February 14, 2020, prison officials transported Lusmat and three other inmates to

Walker.[75] Upon his arrival, prison officials placed Lusmat in a single cell in the Admitting and

Processing area ("A & P area").[76] A short time later, Correctional Officer Hermanowski moved

an inmate, who was a member of a gang that was a rival of Lusmat's alleged gang, the Bishop

Bloods, into a large cell, opened Lusmat's cell door, and directed Lusmat to move to the large

cell, saying "this should be good."[77] As Lusmat approached the cell, the rival gang member

moved towards Lusmat, and the two began fighting.[78] Lusmat alleges that he fought out of self-

defense and only hit with closed fists.[79] After the fight, prison officials placed Lusmat back in

the smaller cell to await his return to Northern.[80] Captain Salius commented that he knew that

Lusmat would fight with the other inmate, and he and several officers had been "on standby" in

the A/P room because they "all knew [the fight] would happen."[81] Officers Hermanowski and

Baez told Lusmat that he was the underdog in their bet regarding the fight and they had won

money.[82]

When Lusmat protested that the officers and officials in the A & P area had set him up,

---

[71] *Ibid.*
[72] *Ibid.* (¶ 35).
[73] *Ibid.* (¶ 34).
[74] *Ibid.* (¶ 36).
[75] *Ibid.* (¶¶ 37-38).
[76] *Ibid.* (¶ 38).
[77] *Id.* at 10 (¶¶ 42, 44).
[78] *Ibid.* (¶ 43).
[79] *Ibid.*
[80] *Ibid.*
[81] *Ibid.*

they suggested that "the higher ups in Central office" had set him up.[83] Lusmat received a disciplinary report for fighting.[84]

On May 8, 2020, Lusmat and seventeen other inmates or detainees at Northern covered the windows in their cell doors to protest the abuse of another inmate by correctional officers.[85] Correctional officers removed Lusmat from his cell, sprayed him with mace, escorted him to another cell and placed him on in-cell restraints consisting of handcuffs, a tether chain, and leg shackles.[86] Although Lusmat asked Lieutenant Medina for permission to wash the residue of mace from his face, Lieutenant Medina refused the request and kept Lusmat on in-cell restraints for 15 hours.[87] The walls of the cell were covered with feces, and the sink was covered with vomit and spit.[88] Lusmat could not flush the toilet from inside the cell, officers refused to flush it for him, and he was unable to use the toilet.[89]

On June 16, 2020, prison officials transferred Lusmat to the administrative segregation unit pending a hearing about the incident of May 8, 2020.[90] Correctional Officer M. Worilds was assigned to be Lusmat's advocate in connection with the hearing.[91] On June 19, 2020, Counselor Supervisor Tugie and Counselor Riccio continued the hearing because Lusmat had not met with Correctional Officer Worilds.[92] On June 26, 2020, Counselor Supervisor Tugie and Counselor Riccio held the administrative segregation hearing despite the fact that Correctional Officer

---

[82] *Ibid.* (¶¶ 40-42).
[83] *Ibid.* (¶ 44).
[84] *Id.* (¶ 46).
[85] *Id.* at 13 (¶¶ 72, 78).
[86] *Id.* at 13-14 (¶ 79).
[87] *Ibid.*
[88] *Id.* at 14 (¶ 79).
[89] *Ibid.*
[90] *Id.* at 13 (¶¶ 73-74).
[91] *Ibid.* (¶ 75).
[92] *Ibid.* (¶ 74).

Worlids was not present.[93] On June 29, 2020, Counselor Supervisor Tugie and Counselor Riccio found Lusmat guilty of orchestrating the protest of the use of force by prison officials against another inmate.[94] OCPM Director Maiga authorized Lusmat's placement on Administrative Segregation status as a result of the guilty finding.[95] Of the seventeen inmates who participated in the protest, only Lusmat and one other inmate were placed on administrative segregation status.[96]

Lusmat remained on administrative segregation status for four months.[97] During Lusmat's confinement on that status, he experienced the following conditions: five hours of recreation a week; placement in handcuffs and leg shackles prior to being escorted to the shower; placement in handcuffs; leg shackles and a tether chain prior to being escorted anywhere else outside of his cell; one pre-paid telephone call a week; one haircut a month; visits with immediate family only; no congregate meals; and a spending limit of $25.00 per visit to the commissary.[98]

In July 2020, after Lusmat complained for months about shoulder pain due to being handcuffed behind his back, a radiologist took x-rays of Lusmat's shoulders.[99] After receiving the X-ray results, a medical provider at Northern scheduled Lusmat for an MRI at the University of Connecticut Health Center.[100]

---

[93] *Ibid.* (¶ 76).
[94] *Ibid.* (¶ 77).
[95] *Id.* at 13-14 (¶¶ 78, 89).
[96] *Id.* at 13 (¶ 78).
[97] *Ibid.*
[98] *Id.* at 14 (¶¶ 85-87).
[99] *Ibid.* (¶ 58).
[100] *Ibid.*

Lusmat mentioned to Officer Laprey that he had ordered a book called the *Rise and the Fall of the Almighty Black Peace Stone Nation*.[101] SRG Coordinator Papoosha instructed Officer Laprey not to give Lusmat the book.[102] Officer Laprey issued Lusmat a rejection notice on June 11, 2020.[103] On July 9, 2020, Warden Bowles signed off on the rejection notice because the book "had SRG affiliation scripture."[104] Lusmat alleges that the book is about a Chicago-based religious group that does not have any affiliation with the gang Stones from California.[105] As of January 9, 2019, the DOC does not consider the Black Peace Stone Rangers or Nation to be an SRG or a disruptive group.[106]

Lusmat filed this federal court complaint on September 15, 2020, and he filed an amended complaint on March 19, 2021.[107] The amended complaint alleges that the defendants unlawfully designated him and redesignated him as a member of an SRG and placed him in the SRG phase program as both a pretrial detainee and as a sentenced inmate, unlawfully placed him on administrative segregation status as a pretrial detainee, and issued him false disciplinary reports in violation of his rights to procedural and substantive due process under the Fourteenth Amendment; subjected him to unconstitutional conditions of confinement as a pretrial detainee in violation of his rights to substantive due process under the Fourteenth Amendment and right to be free from cruel and unusual punishment under the Eighth Amendment; interfered with his right to receive publications; retaliated against him for exercising his right to free speech in

---

[101] *Id.* at 15 (¶ 97).
[102] *Ibid.*
[103] *Ibid.*
[104] *Ibid.* (¶ 98).
[105] *Id.* at 16 (¶ 99).
[106] *Ibid.* (¶ 100).
[107] Docs. #1, #13.

violation of the First Amendment; and deprived him of his fundamental right to marry.[108]

Lusmat seeks money damages and declaratory and injunctive relief.[109]

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint

against a governmental entity or governmental actors and "identify cognizable claims or dismiss

the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or

fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a

defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations

of the complaint must be read liberally to raise the strongest arguments that they

suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).[110]

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to

evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough

facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See,*

*e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). Notwithstanding the rule of liberal interpretation, a *pro se* complaint may not survive

dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes*

*v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

### *Statute of limitations*

Lusmat filed this lawsuit on September 15, 2020.[111] His constitutional claims pursuant to

42 U.S.C. § 1983 are subject to a three-year statute of limitations. *See, e.g., Lounsbury v. Jeffries*,

---

[108] Doc. #13.

[109] *Id.* at 16-17 (¶1-4, 6).

[110] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

25 F.3d 131, 134 (2d Cir. 1994). Accordingly, the statute of limitations presumptively bars Lusmat's claims to the extent that they are based on conduct that occurred prior to three years before he filed this lawsuit—that is, prior to September 15, 2017.

Although the statute of limitations is ordinarily an affirmative defense that must be asserted by a defendant, a district court may "dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted." *Walters v. Industrial and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011); *see also Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (court may dismiss prisoner complaint based on statute of limitations defense that appears on face of the complaint). Here, in the absence of any apparent grounds for tolling, I conclude that the statute of limitations bars Lusmat's action to the extent that he seeks relief for alleged wrongs occurring prior to September 15, 2017.

### First Amendment retaliation – SRG affiliation

The First Amendment protects prison inmates from being subject to retaliation on the basis of an inmate's engagement in protected free speech activity. In order to state a claim for First Amendment retaliation, a prisoner plaintiff must allege facts showing (1) that he engaged in activity that is protected under the First Amendment, (2) that a prison official took an adverse action against him, and (3) that the prisoner's First Amendment activity caused the prison official to engage in the adverse action. *See, e.g., Dolan v. Connally*, 794 F.3d 290, 294 (2d Cir. 2015). An adverse action is an act of sufficient adverse magnitude that it would deter a similarly situated person of ordinary firmness from exercising his right to speech. *See Brandon v. Kintner*, 938 F.3d 21, 40 (2d Cir. 2019).

[111] Doc. #1.

Lusmat alleges that SRG Coordinators White and Papoosha violated his First Amendment rights in May 2019 when they issued disciplinary reports charging him with gang affiliation and subsequently designating him an SRG member for certain language he used in telephone calls and pictures on his social media.

It appears that Lusmat engaged in speech and that SRG Coordinators White and Papoosha took adverse against him by issuing disciplinary tickets. Further, Lusmat's allegations show that SRG Coordinators White and Papoosha used his speech in social media and phone calls as evidence of his gang affiliation. But the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crim or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019) (same). Lusmat's phone calls and social media photos were merely used as evidence to support his SRG member designation. In the absence of an allegation that SRG Coordinators White or Papoosha sought to punish or retaliate against Lusmat simply for engaging in First Amendment-protected expression, the complaint does not plausibly allege a First Amendment retaliation claim. *See Caves v. Payne*, 2020 WL 1676916, at * 4 (D. Conn. 2020) (dismissing First Amendment retaliation claim where the "defendants' use of social media posts and [plaintiff]'s own statements therein, is no different than it [plaintiff] announced upon his arrival at the facility that he was a gang member and the defendants used those statements to designate him to the SRG unit."). Accordingly, I will dismiss Lusmat's First Amendment retaliation claims.

### Deliberate indifference - personal safety

Lusmat alleges that after his readmission in April 2019 as a pretrial detainee, the

defendants were deliberately indifferent to his safety and subjected him to unconstitutional conditions of confinement in violation of the Eighth Amendment when they orchestrated a fight between him and a member of a rival gang.[112]

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. Because Lusmat was a pretrial detainee and not a sentenced prisoner, he cannot bring his claims under the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 30-36 (2d Cir. 2017) (discussing distinction between deliberate indifference claim arising under the Fourteenth Amendment's due process clause for a pretrial detainee and a deliberate indifference claim under the Eighth Amendment for a sentenced prisoner). Instead, the Fourteenth Amendment due process clause protects the rights of pretrial detainees against intentional or deliberate indifference to their serious medical needs or unsafe conditions of confinement. *Ibid.* I will treat Lusmat's claim for deliberate indifference as a claim brought under the Fourteenth Amendment.

To allege a claim for deliberate indifference to safety, a pretrial detainee must satisfy a two-prong test. Under the first prong, a detainee must allege that objectively the challenged "conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to his health…which includes the risk of serious damage to physical and mental soundness." *Id.* at 30. Under the second prong, the pretrial detainee must assert that the prison official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [him or her] even though the [prison]-official knew or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35; *see also Charles v. Orange Cty.*, 925 F.3d 73, 86-87 (2d Cir. 2019).

---

[112] Doc. #13 at 10-15 (¶¶ 49, 56, 78, 94).

As to the first prong, Lusmat alleges that on February 14, 2020, he was transferred to Walker and that Officer Hebernowski placed him in a cell with an inmate who was a member of a rival gang.[113] This allegation satisfies the first prong. Gang-affiliated inmates may face a substantial risk of harm if they are housed with members of rival gangs. *See Thawney v. City of New York*, 2018 WL 4935844, at *4 (S.D.N.Y. 2018) (citing cases).

As to the second prong, Lusmat alleges that Captain Salius and numerous other officers watched the subsequent fight between Lusmat and the rival gang member and told him "we all knew it would happen."[114] He alleges that Officers Hebernowski and Baez said that the officers had bet on the outcome of the fight and watched it play out.[115] Because it is well established that an officer acts with deliberate indifference if he is aware of an attack and does not intervene, *see, e.g., Taylor v. City of New York*, 2018 WL 1737626, at *12 (S.D.N.Y. 2018) (plaintiff stated a claim for deliberate indifference to safety against defendant who witnessed attack and failed to take action to prevent), and Lusmat alleges here that Officer Hebernowski actively placed him in harm's way and that Captain Salius and Officer Baez witnessed the fight and did not intervene, I will allow a deliberate indifference claim against them to proceed.

### Deliberate indifference claim- medical needs

Lusmat alleges that the Officer Cabonneau was deliberately indifferent to his health and safety in July 2019 because he double locked Lusmat's cuffs so tight that he bled.[116] When medical arrived in response to Lusmat's request for treatment, Lusmat alleges that the blood was dry on his skin, medical took pictures, and scheduled him for a follow up appointment that never

---

[113] *Id.* at 10 (¶ 42).
[114] *Id.* at 10 (¶¶ 42, 44).
[115] *Id.* at 10 (¶ 44).
[116] Doc. #13 at 11 (¶ 57).

occurred.[117] Lusmat alleges that a year later, after several months of shoulder pain caused by being handcuffed, Lusmat's shoulder was X-rayed and a follow up MRI was scheduled.[118]

For a deliberate indifference to medical needs claim, a pretrial detainee must first show that the medical need was "sufficiently serious" to warrant the need for treatment. *See Darnell*, 849 F.3d at 29. A "sufficiently serious" need is an urgent medical condition that is capable of causing death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

Lusmat has not alleged that the cuts from the handcuffs or his shoulder pain caused extreme pain, degeneration, or death. Further, handcuffs that are too tight are generally not sufficiently serious to meet the objective prong. *See Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) (swelling and cuts from tightness of handcuffs not sufficiently serious). And even assuming that the medical conditions were sufficiently serious, Lusmat has failed to allege that any defendant was deliberately indifferent to his medical needs. To the contrary, it appears that the defendants treated him for the tight handcuffs and are currently treating his shoulder pain. Although he alleges that he was supposed to have a follow up appointment that never occurred, Lusmat does not allege any harm arising from not attending that appointment. Accordingly, I will dismiss the deliberate indifference claim arising from wrist and shoulder pain.

### Fourteenth Amendment due process claims

The Due Process Clause of the Fourteenth Amendment protects both a right to "substantive" due process and "procedural" due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-6 (1998); *Wilson v. Santiago*, 2020 WL 1989135, at *3 (D. Conn. 2020). For

---

[117] *Ibid.*
[118] *Ibid.* (¶ 58).

19

either type of due process claim, a prisoner must plausibly allege at the outset that he was deprived of a property or liberty interest. *See Baez v. Pinker*, 673 F. App'x 50, 52 (2d Cir. 2016).

If a sentenced prisoner claims a deprivation of a liberty interest related to his designation to a restrictive housing unit, the prisoner generally must allege facts to show that the restrictive terms of confinement amounted to an "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Thus, in *Sandin*, the Supreme Court concluded that a sentenced prisoner who was subject to a disciplinary term limited to only 30 days confinement in restrictive housing did not sustain an atypical and significant hardship to constitute a deprivation of a liberty interest that would be subject to protection under the Due Process Clause. *Id.* at 486.

Following *Sandin*, the Second Circuit has explained that the "[f]actors relevant to determining whether [a sentenced prisoner] endured an atypical and significant hardship include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Palmer*, 364 F.3d at 64. The Second Circuit has further observed that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (*per curiam*).

Importantly, the heightened *Sandin* standard of whether a sentenced prisoner has been subject to an atypical and significant hardship does not apply to pretrial detainees who claim that they have been deprived of a liberty interest. *See Benjamin v. Fraser*, 264 F.3d 175, 188-89 (2d Cir. 2001). That is because "a state's authority over pretrial detainees is limited by the

Constitution in ways that the treatment of convicted persons is not." *McGarry v. Pallito*, 687 F.3d 505, 513 (2d Cir. 2012). Thus, for example, a pretrial detainee has a constitutional right to be free from conditions of confinement that amount to punishment, because the government has no right to punish a pre-trial detainee prior to an adjudication of guilt in accordance with due process of law. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

If a sentenced prisoner or a pretrial detainee plausibly alleges the deprivation of a liberty interest, then procedural due process requires that prison officials use fair procedures before engaging in any deprivation of a liberty interest. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*). The case law distinguishes between the procedures that are required for the use of restrictive conditions of confinement for disciplinary purposes as distinct from administrative management or security purposes. *See Benjamin*, 265 F.3d at 190. For disciplinary segregation, a prisoner must receive written notice of the disciplinary charge, adequate time to prepare a defense, a written statement of the reasons for the disciplinary action that has been taken, and some ability to present witnesses and evidence in his defense. *See ibid.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 561-70 (1974)).

For administrative segregation, less is required; a prisoner must merely receive some notice of the basis for restrictive terms of confinement and an opportunity to present his views. *See ibid.* The opportunity of a prisoner to present his views may be provided after the detention begins but must take place within a reasonable time, and the prisoner must also receive periodic review of an administrative detention to ensure that this type of detention is not used as a pretext for indefinite restrictions that no longer serve their purpose. *See Hewitt v. Helms*, 459 U.S. 460, 467-68, 477 (1983); *see also Williamson v. Stirling*, 912 F.3d 154, 173-77 (4th Cir.

2018) (discussing legal standards governing due process claims by convicted prisoner and pretrial detainees with respect to restrictive terms of confinement).

Apart from these protections of procedural due process, pretrial detainees have rights to substantive due process. In general, substantive due process protects pretrial detainees from restrictive conditions of confinement that are imposed for a prohibited punitive purpose or that are otherwise arbitrary and not reasonably related to the lawful grounds for imprisonment. *See Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017).

In the context of a pretrial detainee's claim against restrictive conditions of confinement, the Second Circuit has made clear that administrative segregation measures do not "violate substantive due process where prison officials subject[ ] pretrial detainees to such measures in response to specific evidence that those detainees posed a risk to institutional security, and where the measures were not excessive in relation to that purpose." *Id.* at 56. Put differently, "[a]lthough prison officials are to be afforded deference in matters of institutional security, such deference does not relieve officials from the requirements of due process or permit them to institute restrictive measures on pretrial detainees that are not reasonably related to legitimate governmental purposes." *Id.*

In *Almighty Supreme Born Allah v. Milling*, the Second Circuit concluded that prison officials violated due process when they placed a pretrial detainee in administrative segregation "solely on the basis of his prior assignment to (and failure to complete) the Administrative Segregation program during a prior term of incarceration" and when prison officials "adhered reflexively to a practice that did not allow for individualized consideration of [the plaintiff's] circumstances and that required him to be placed in Administrative Segregation regardless of his

22

actual threat, if any, to institutional security." *Id.* at 57. Additionally, the Second Circuit made

clear that substantive due process also applies to the conditions imposed on the detainee, which

must be reasonably related to a legitimate government purpose, such as institutional

security. *See id.* at 55. The Second Circuit examined certain conditions that had been imposed on

Allah during his confinement in the administrative segregation program as a pretrial detainee and

questioned whether those conditions "were reasonably related to the ostensible goal of prison

security," including strict limits on visits, phone calls, and mail and whether certain

conditions "although plausibly related to security concerns in general, were so excessively harsh

as to be punitive," such as solitary confinement for 23 hours per day, showering in leg irons, and

no access to programming, counseling or therapy. *Id.* at 58; *see also Darnell v. Pineiro*, 849 F.3d

17, 29 (2d Cir. 2017) (discussing general conditions of confinement requirements to provide

food, clothing, and shelter for pretrial detainees under the Fourteenth Amendment).

Because Lusmat brings several different due process claims concerning his designation as

an SRG member and placement in administrative segregation with different factual allegations,

including his status as a pretrial detainee or sentenced prisoner, I will address each in turn.

### *April 2018 disciplinary hearing*

Lusmat brings a procedural due process claim against Officer Sciascia, Officer Major,

Correctional Officer John Doe #1, and Captain Kenny on the basis of Lusmat's placement in

punitive segregation after Captain Major issued an April 2018 disciplinary report for SRG

affiliation based on Lusmat's alleged use of the phrase "Fa-Laws" day in a telephone

conversation.[119] At the time he was a sentenced prisoner. He alleges that the defendants violated

his procedural due process rights because he did not receive documents or a transcript of the

telephone call prior to or at the disciplinary hearing and that the investigation and supporting evidence that led to his guilty finding was inadequate.[120] He also brings a due process challenge to the punitive sanctions that disciplinary hearing officer imposed on him, which included 20 days confinement in punitive segregation, 15 days loss of risk reduction credits, including 90 days loss of commissary, 90 days loss of telephone privileges, and being forced to use a "sponge on a stick."[121] The loss of risk reduction credits is a sanction that affects the duration of an inmate's confinement.[122]

Because Lusmat brings a procedural due process challenge arising from his disciplinary hearing that resulted in a punishment that affects the duration and conditions of confinement, his claim concerns "mixed sanctions," *i.e.*, "sanctions that affect both (a) the duration of imprisonment and (b) the conditions of confinement." *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006). The Second Circuit has held that "a prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule of *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), *but ... he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement.*" *Id.* at 104 (emphasis in original). If Lusmat were to prevail on his challenge to the disciplinary report issued to him for SRG affiliation in April 2018, the guilty finding would be called into question. Lusmat's procedural due process claim concerning the April 2018 disciplinary hearing is thus barred by

---

[119] Doc. #13 at 6 (¶ 10).

[120] Doc. #13 at 5-6 (¶¶ 2-3, 5-11).

[121] *Id.* at 6 (¶ 9).

[122] *See* State of Connecticut Department of Correction Administrative Directive 4.2A(4) (2013), *available at* https://portal.ct.gov//media/DOC/Pdf/Ad/ad0402Apdf.pdf ("RREC could affect an inmate's discharge date if in compliance.")

*Heck* because he has not filed a notice that he foregoes a challenge to his risk reduction credit sanction. *See Delgado v. Concepcion*, 2020 WL 4926615, at *5 (D. Conn. 2020).

Accordingly, Lusmat shall advise the Court in writing, within 20 days of the filing date of this Order, whether he waives *for all time* all claims in this action relating to disciplinary sanctions affecting the duration of his confinement (*i.e.*, the forfeiture of 15 days of risk reduction credit) in order to proceed with his Fourteenth Amendment procedural due process claims challenging the issuance of the disciplinary report by Officer Moore on April 5, 2018, the investigation performed by Officer Sciascia, the evidence submitted by Officer John Doe #2, the comments made by Captain Penny, and the sufficiency of the evidence relied upon by the hearing officer to find him guilty of the charge of SRG affiliation.

### April 2018 – August 2018 conditions of confinement

Lusmat alleges that his substantive due process rights were violated when he was in the SRG program from April 2018 to August 2018. But he does not describe the conditions he endured during his confinement in the SRG program for four months before his release from custody. Because he has not alleged that he experienced any "atypical or significant" hardships while in the SRG program for these four months, I conclude that he has not alleged a liberty interest sufficient to invoke due process protection. *See Sandin*, 515 U.S. at 484; *see also Delgado*, 2020 WL 4926615, at *2, 6 (finding no liberty interest from placement in restrictive housing where plaintiff alleged only "great discomfort"). Accordingly, I will dismiss the substantive due process claim associated with his placement in the SRG program following his redesignation as an SRG member in April 2018 asserted against SRG Coordinator Aldi and Warden John Doe #1.

*April 2019 readmission to SRG – procedural due process*

Lusmat alleges that his procedural due process rights were violated when he was admitted to DOC as a pretrial detainee in November 2018 and April 2019 and assigned to phase one of the SRG program.[123] Lusmat alleges that he was never given a hearing and that because he was discharged in August 2018 while in phase two, then he should have been assigned to phase two rather than phase one.[124]

Although Lusmat alleges that SRG Coordinators Papoosha and White informed him at some point after the designation him that the evidence used to place him in the SRG program included videos and photos posted to his social media, the allegations plausibly show that his placement was procedurally deficient in that he was never given a meaningful opportunity to be heard.[125] *See Benjamin*, 264 F.3d at 188, 190 (2d Cir. 2001) (a pretrial detainee who is placed in segregation for administrative reasons is entitled to "some notice of the charges against him and an opportunity to present his views"). Accordingly, I will allow his procedural due process claim concerning his SRG placement in April 2019 to proceed against SRG Coordinators Papoosha and White.

In connection with this procedural due process claim, Lusmat also alleges that G. Mudano was the current warden.[126] "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of*

---

[123] Doc. #13 at 6 (¶¶ 14, 17).

[124] *Id.* at 7 (¶ 25). Administrative Directive 6.14, § 18 provides in relevant part that "[a]n inmate discharged from the custody of the Commissioner while designated an [SRG] Member shall be readmitted on the same status." *See* Administrative Directive 6.14, *available* at https://portal.ct.gov/DOC/AD/AD-Chapter-6 [last accessed July 9, 2021].

[125] Doc. #13 at 6 (¶ 19).

[126] Doc. #13 at 6 (¶ 19).

*New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Because Lusmat has not alleged how Warden Mudano was involved in or had knowledge of his SRG designation, I will dismiss the procedural due process claim against Warden Mudano.

### April 2019 placement in SRG – substantive due process

Lusmat alleges that he endured the following conditions after his initial placement in phase one of the SRG program in April 2019 as well as after he progressed to phase two of the program and regressed back to phase one of the program: confinement in his cell for 23 hours a day on weekdays and 24 hours a day on weekend days; five hours of outside recreation a week in handcuffs behind his back regardless of the weather; three showers a week in an unsanitary shower stall; no more than three telephone calls a week to immediate family and friends; a spending limit of $25.00 per visit to the commissary; and strip searches and placement in handcuffs every time he left his cell.[127] Lusmat had no access to a television, cd player, hot pot, nail clippers, holiday packages, congregate religious services, contact visits with family or non-family members, non-contact visits with friends, educational programming, social programming, counseling, or therapy.[128] Lusmat contends that these conditions were punitive, excessive, and unrelated to any legitimate safety or security concerns.

Lusmat has plausibly alleged that the conditions in phase one and two of the SRG program constituted punitive conditions because they were excessively harsh and not sufficiently related to a legitimate objective such as safety or security. *See Almighty Supreme Born Allah*, 876 F.3d at 58 (examining certain conditions that had been imposed on plaintiff during his confinement in the administrative segregation program as a pretrial detainee). But the allegations

---

[127] *Id.* at 11-12 (¶¶ 55-56, 60-63).
[128] *Ibid.* (¶ 61, 63-64, 69-70).

in the amended complaint do not state which—if any—of the named defendants were personally involved with imposing any of these conditions, and they only contain conclusory allegations that the supervisory defendants had knowledge of the imposition of these conditions. Lusmat only lists the various conditions to which he was subjected in phase one and two and that Chevalier "ignored [his] request" that he should not be in the SRG program, and Warden Mudano and Bowles "housed [him] here illegally" without alleging whether Chevalier, Mudano, and Bowles knew of the conditions.[129] Because Lusmat fails to allege facts that any of the named defendants had personal involvement in causing Lusmat's harsh conditions, I will dismiss his substantive due process claim related to the conditions in phase one and two. *See Grullon*, 720 F.3d at 138 (plaintiff must allege personal involvement of defendants); *Wilson v. Santiago*, 2020 WL 5947322, at *5 (D. Conn. 2020) (dismissing substantive due process claim where plaintiff failed to name the personal involvement of defendants).

### June 2020 disciplinary hearing

Lusmat describes how he was sent to administrative segregation in June 2020 for covering his window as a form of protest to prison abuse.[130] He alleges that Tugie and Riccio held a hearing without the participation of his advocate Woirlds and found him guilty.[131] He alleges that being placed in administrative segregation amounts to "cruel and unusual punishment" but does not otherwise describe the conditions of his confinement resulting from the June 2020 incident.[132]

Lusmat has plausibly alleged a violation of his procedural due process rights in

---

[129] Doc. #13 at 11 (¶ 53).
[130] Doc. #13 at 13 (¶¶ 72-73).
[131] *Id.* (¶¶ 75-76).
[132] *Id.* (¶ 78).

connection with the June 2020 hearing. An inmate has a limited right to assistance at a

disciplinary hearing. *See Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988) (explaining that an

inmate is entitled to assistance in a disciplinary hearing when the inmate is illiterate or the issues

extremely complex); *see also Wolf v. McDonnell*, 418 U.S. 539, 566-568 (1974) (inmate not

entitled to counsel in disciplinary hearing). An inmate confined to a restrictive housing unit does

have the right to some assistance to marshal evidence the evidence and present a defense. *See

Eng*, 858 F.2d 889, 898 (2d Cir. 1988) (inmate in restrictive housing entitled to assistance of

advocate to prepare for disciplinary hearing); *Pagan v. Dougherty*, 2019 WL 2616975, at *7 (D.

Conn. 2019) (no due process violation where inmate in restrictive housing had an advocate).

Because Lusmat alleges that he was placed in administrative segregation pending his hearing, he

was entitled to the assistance of his advocate. Because Lusmat alleges that Tugie and Riccio held

the hearing knowing that Lusmat had never met with his advocate, I will allow a procedural due

process claim to proceed against Tugie and Riccio.

### *False disciplinary report*

Lusmat alleges that Correctional Officer Laprey and SRG Coordinator Papoosha issued

him a false disciplinary report in January 2020. The charge was dismissed before the hearing.

Inmates have "no constitutionally guaranteed immunity from being falsely or wrongly accused of

conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout*,

808 F.2d 949, 951 (2d Cir. 1986); *Best v. Smith*, 2014 WL 4782702, at *3 (D. Conn. 2014).

Accordingly I will dismiss the false disciplinary report claim.

In connection with this claim, Lusmat also alleges that his due process rights were

violated because he was placed in segregation for 15 days before the charge was dropped. During

that time, SRG Coordinator Papoosha restricted Lusmat's telephone access and even after the charge was dropped continued to restrict Lusmat's access to two numbers.

The Second Circuit has affirmed dismissal of due process claims when the period of confinement was "exceedingly short," usually less than thirty days, and there are no indications of "atypical and significant hardship." *See Palmer*, 364 F.3d at 64. Because Lusmat has alleged that his confinement in segregation was short and he does not otherwise allege anything about his confinement that would support a conclusion that he endured atypical or significant hardship in relation to the ordinary incidents of prisoner life, I will dismiss the due process claim against Officer Laprey and SRG Coordinator Papoosha in relation to the false disciplinary report allegation.

### Denial of telephone use

Neither the Supreme Court nor the Second Circuit has yet addressed whether a prisoner has a First Amendment right to make phones calls. *See Baxter v. Wagner*, 802 F. App'x 32, 33 n. 1 (2d Cir. 2020); *McMillan v. Cty of Onondaga*, 710 F. App'x 458, 460 (2d Cir. 2017) ("Assuming, without deciding, that a prisoner has a limited right to use a telephone to communicate with his attorney and perhaps others…"). Courts within this circuit have generally held that restrictions on telephone usage are constitutional as long as alternative means of communicating with others outside of prison are available. *Pape v. Cook*, 2021 WL 2186427, at *6 (D. Conn. 2021) (collecting cases); *see also Fisher v. Dep't of Corr.*, 1995 WL 608379, at *7 (S.D.N.Y. 1995) (restrictions on telephone access to counsel not a constitutional violation where prisoner could communicate with counsel through other means). Here, Lusmat has not alleged that he was unable to communicate with counsel or that any defendant completely restricted his

ability to communicate with people outside the prison. Accordingly, I will dismiss his claim.

### Denial of book

The U.S. Constitution permits greater restriction of prisoners' First Amendment rights than it permits for other persons. *See Beard v. Banks*, 548 U.S. 521, 528 (2006). The prison's restriction limiting free speech, however, must be "reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987). Under certain circumstances, confiscation of a book may constitute a First Amendment violation. *See Beard*, 548 U.S. at 528-29 (applying First Amendment analysis where prison restricted plaintiffs' access to newspapers, magazines, and photographs); *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (overturning dismissal of a plaintiff's complaint that alleged First Amendment violation where prison officials confiscated nude photographs that had been mailed to him); *Wilkinson v. Skinner*, 462 F.2d 670, 673 n.5 (2d Cir. 1972) ("refusal to deliver a newspaper [to a prison inmate] would ordinarily be interference with appellant's first amendment rights").

Lusmat alleges that Officer Laprey, SRG Coordinator Papoosha, and Warden Bowles violated his First Amendment rights when they denied him access to a book about the Black Peace Stone Nation.[133] He alleges that although the reason given for the denial was that the book had SRG affiliation, the book is about a Chicago-based group that is not affiliated with any gang.[134] Because Lusmat has plausibly alleged that the denial of the book is not related to legitimate penological interests, I will allow the First Amendment claim to proceed against Officer Laprey, SRG Coordinator Papoosha, and Warden Bowles.

### Unsanitary conditions of confinement

---

[133] Doc. #13 at 15-16 (¶¶ 97-101).
[134] *Id.* at 15-16 (¶¶ 98-99).

Lusmat alleges that on May 8, 2020 while he was at Northern, Lieutenant Medina violated his Fourteenth Amendment rights by subjecting him to unsanitary conditions of confinement during his placement on in-cell restraints following Lusmat's participation in a protest.

Inmates have a right to sanitary living conditions. *See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013). Conditions are unsanitary where "the area in front of a prisoner's cell is filled with human feces, urine, and sewage water,…a prisoner's cell is fetid and reeking from the stench of the bodily waste of previous occupants,…a prisoner's cell floor has urine and feces spattered on the floor." *McFadden v. Noeth*, 827 F. App'x 20, 29 (2d Cir. 2020). The Second Circuit has rejected "any bright-line durational requirement for a viable unsanitary-conditions claim," instructing that an unconstitutional unsanitary conditions claim "depends on both the duration and severity of the exposure." *See Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (reversing district court's dismissal for failure to state a conditions of confinement claim where inmate plaintiff alleged that while kept naked in a strip cell, he was exposed, at a minimum, to seven days of human waste).

Here, Lusmat alleges that he was in pain because Lieutenant Medina would not let him wash mace off his face for at least fifteen hours, that the cell was filled with feces, throw-up, spit, and that Lusmat was unable to relieve himself because the toilet would not flush and was full of feces.[135] Although it is unclear from the facts in the complaint whether the conditions reach both the severity and duration necessary for Lusmat to prevail on this claim, for purposes of initial review, Lusmat has plausibly stated a claim for unsanitary conditions of confinement. He has also sufficiently alleged that Lieutenant Medina knew about and was responsible for these issues.

Accordingly, I will allow Lusmat's claim of unsanitary conditions to proceed against Lieutenant Medina.

### *Denial of marriage*

Lusmat alleges that while he was in the SRG program, Warden Mudano and Captain Chevelier denied him the right to marry. The Supreme Court has recognized that prisoners have the right to marry and prison regulations that prohibit prisoners from marrying unless the prison superintendent approves are unconstitutional. *See Turner*, 482 U.S. at 96-97. For the purposes of initial review, Lusmat has sufficiently alleged that his rights were violated when they refused to allow him to marry. I will allow this claim to proceed against Warden Mudano and Captain Chevelier.

### *Named defendants personally involved*

Lusmat names Deputy Warden Jones in the caption of the complaint but does not otherwise describe his involvement.[136] "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon*, 720 F.3d at 138. To the extent that Lusmat is pleading a theory of supervisory liability, the Second Circuit has clarified that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Because Lusmat does not make any factual allegations against Deputy Warden Jones, I will dismiss him as a defendant.

---

[135] Doc. #13 at 13-14 (¶ 79).
[136] Doc. #13 at 4.

### *Official capacity claims and declaratory relief*

Lusmat has sued all defendants in their individual and official capacities for punitive and compensatory damages.[137] State officials sued in their official capacities under 42 U.S.C. § 1983 are immune from suit for damages pursuant to the Eleventh Amendment. *See Pennhurst State Sch. & Hops. v. Halderman*, 465 U.S. 89, 100-02 (1984); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002). Likewise, they are immune from declaratory relief to the extent a declaration is sought that they have previously violated the law. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). Accordingly, I will dismiss the official capacity claims for damages and for a declaratory judgment.

### *42 U.S.C. §§ 1985 and 1986*

Lusmat invokes the Court's authority under 42 U.S.C. §§ 1985 and 1986.[138] He does not otherwise refer to sections 1985 or 1986 in the body of the complaint or make allegations that defendants were involved in a conspiracy. Even assuming that he had made such allegations, his § 1985 claim is foreclosed by the rule—known as the "intracorporate conspiracy" doctrine—that members of the same organization may not be held liable for conspiracy under federal civil rights law. *See Federal Ins. Co. v. United States*, 882 F.3d 348, 368 n. 14 (2d Cir. 2018); *Dupigny v. Hannah*, 2021 WL 151043, at *4 (D. Conn. 2021). As for any claim under 42 U.S.C. § 1986, it necessarily fails because a violation of § 1986 may proceed only if a plaintiff is able to establish a predicate claim under § 1985. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000). Accordingly, I will dismiss Lusmat's conspiracy claims.

### CONCLUSION

---

[137] Doc. #13 at 4, 16-17.
[138] Doc. #13 at 2 (¶ 1).

The Court enters the following orders:

(1)     Lusmat's deliberate indifference claim in connection with the February 2020 fight

may proceed against Hebernowski, Salius, and Baez in their individual capacities;

his procedural due process claim in connection with his readmission to the SRG

program in 2019 may proceed against Papoosha and White in their individual

capacities; his procedural due process claim in connection with the June 2020

hearing may proceed against Tugie and Riccio in their individual capacities; his

First Amendment claim concerning the denial of a book may proceed against

Laprey, Papoosha, and Bowles in their individual capacities; his unsanitary

conditions of confinement claim against Medina may proceed in his individual

capacity; and his denial of marriage claim against Mudano and Chevalier may

proceed in their individual capacities. This ruling allowing some of Lusmat's

claims to proceed is without prejudice to the right of the defendants to file a

motion to dismiss. All other claims against other defendants are DISMISSED on

the ground that they are barred by the statute of limitations or that Lusmat has not

alleged plausible grounds for relief.

(2)     If Lusmat seeks to bring a Fourteenth Amendment due process claim challenging

the mixed sanctions imposed as a result of the guilty finding of the April 2018

disciplinary report, he must advise the Court in writing by **August 18, 2021**

whether he waives for all time all claims in this action relating to disciplinary

sanctions affecting the duration of this confinement (*i.e.*, the forfeiture of RREC)

in order to proceed with his claims challenging the disciplinary finding. Failure to

file such a statement within the required time will be deemed to constitute his refusal to waive those claims and will result in dismissal of this due process claim.

(3)    If Lusmat believes in good faith that he can allege additional facts to sustain liability against any defendant, then he may file an amended complaint by August 18, 2021.

(4)    The Clerk shall verify the current work addresses Hebernowski, Salius, Baez, Papoosha, White, Tugie, Riccio, Laprey, Bowles, Medina, Mudano, and Chevalier with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint of those defendants at the confirmed addresses **within twenty-one (21) days of this Order**, and report to the Court on the status of the waiver requests by no later than the **thirty-fifth (35) day** after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(5)    All defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

(6)    The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(7)    The discovery deadline is extended to **six months (180 days)** from the date of this

Order. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must sent to plaintiff with a copy of this Order. The order can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

(8)  The deadline for summary judgment motions is extended to **seven months (210 days)** from the date of this Order.

(9)  Pursuant to Local Rule 7(a), a nonmoving party must respond to a dispositive motion (*i.e.*, a motion to dismiss or a motion for summary judgment) within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

(10) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he must indicate all of the case numbers in the notification of change of address. Plaintiff must also notify defendants or defense counsel of his new

address.

(11)   Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with

the Court. Plaintiff is advised that the Program may be used only to file with the

Court. As discovery requests are not filed with the Court, the parties must serve

discovery requests on each other by regular mail.

It is so ordered.

Dated at New Haven, Connecticut this 29th day of July 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge
