## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                       :

ALLEN LUSMAT,                  :            NO. 3:20-CV-1386(RMS)
*Plaintiff,*                  :

                       :

*v.*                           :

                       :

DANIEL PAPOOSHA, *et al.*,    :
*Defendants.*             :

                       :            DATE: JUNE 27, 2023

                       :

------------------------------------------------------- x

## RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Allen Lusmat ("Lusmat" or the "plaintiff") is currently sentenced and incarcerated at MacDougall-Walker Correctional Institution ("MWCI").[1]   Proceeding *pro se* and *in forma pauperis*, he sued twenty-three individual employees[2] of the Connecticut Department of Correction ("DOC") pursuant to 42 U.S.C. § 1983 for various alleged violations of his 14th Amendment rights occurring while he was a pre-trial detainee.

After initial review, only six claims against twelve defendants remained: (1) an unsanitary condition of confinement claim against defendant Medina in his individual capacity; (2) a denial of marriage claim against defendants Mudano and Chevalier in their individual capacities; (3)  a

---

[1]  The State of Connecticut Department of Correction website reflects Lusmat has now been sentenced.  *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=371043.  *See Simms v. Cuzio*, No. 3:21-CV-00492(SALM), 2022 WL 3107150, at *1 (D. Conn. Aug. 4, 2022) (taking judicial notice of plaintiff's incarceration status from the Connecticut DOC website); *Vera v. United States*, No. 3:11-CV-00864-VAB, 2017 WL 3081666, at *3 n.2 (D. Conn. July 19, 2017) (taking judicial notice of the results BOP's inmate locator search).

[2] The Amended Complaint names the following twenty three DOC personnel as defendants: Strategic Response Group ("SRG") Coordinators D. Papoosha, John Aldi, and White; Director of Security A. Santiago; Offender Classification and Population Management Director ("OCPM Director") Dave Maiga; Wardens R. Bowles, G. Mudano, Mulligan, and John Doe #1; Deputy Warden K. Jones; Captains Chevalier, Kenny, and Salius; Lieutenant Medina; Correctional Officers Laprey, M. Worilds, Major, Sciascia, Hermanowski, Baez, and John Doe #2; Correctional Counselor Supervisor E. Tugie; and Correctional Counselor R. Riccio.  (*See* Doc. No. 13 at 2-4 ("Am. Compl."); Doc. No. 20 at 1 (the "IRO")).

procedural due process claim in connection with his readmissions to the Strategic Risk Group ("SRG") program in August 2018 and April 2019 against defendants Papoosha and White in their individual capacities; (4) a procedural due process claim in connection with a June 2020 administrative segregation hearing against defendants Tugie and Riccio in their individual capacities; (5) a First Amendment claim concerning the denial of a book against defendants Laprey, Papoosha, and Bowles in their individual capacities; and, (6) a deliberate indifference claim in connection with a February 2020 inmate-on-inmate fight against defendants Hermanowski,[3] Salius, and Baez in their individual capacities.

The defendants have moved for summary judgment on these six claims arguing that the plaintiff has failed to exhaust his administrative remedies under the Prison Litigation Reform Act (the "PLRA") as to the first three claims and that the remaining three claims fail on the merits. Further, all defendants contend that they are immune from damages under the doctrine of qualified immunity.

For the reasons discussed below, the defendants' motion is **GRANTED in part** and **DENIED in part**.

## I.   PROCEDURAL HISTORY

On September 15, 2020, the plaintiff, appearing *pro se*, filed an initial complaint and a motion to proceed *in forma pauperis*.  (Doc. Nos. 1, 2).  On December 1, 2020, the plaintiff was granted leave to proceed *in forma* pauperis.  (Doc. No. 8).  The plaintiff then moved to amend his

---

[3] The defendant's Amended Complaint initially names defendant "Hermanoski," a correction officer at Walker Correctional Institution, (*see* Am. Compl. at ¶ 22), but later names a "Hebernowski" in describing certain allegedly unconstitutional conduct suffered by the defendant.  (*Id.* at ¶¶ 42, 44).  The Initial Review Order ("IRO") similarly adopts both spellings in the same context.  (*See* IRO at 10, 18) (citing Am. Compl. at ¶¶ 42, 44).  Despite the two different spellings, there appears to be only one defendant involved in the alleged conduct: Hermanowski. This is confirmed by the waiver of service and consent to this Court's jurisdiction filed on the docket as well as other evidence submitted.  (*See* Doc. Nos. 25, 98 113-17).  Therefore, the Court treats any mention of "Hebernowski" as a scrivener's error and will refer hereinafter only to defendant Hermanowski as such.

original complaint on March 19, 2021, to add new defendants and a revised statement of facts. (Doc. No. 13 at 1) (the "Amended Complaint" or "Am. Compl.").  The Court (Meyer, J.) granted the motion to amend and deemed the Amended Complaint the operative complaint in this action. (Doc. No. 14).[4]

On July 29, 2021, the Court (Meyer, J.) issued an Initial Review Order permitting the plaintiff to proceed on six claims for damages against the remaining defendants in their individual capacities, *see supra*, but dismissing all other claims on the grounds that they were either barred by the statute of limitations or that they did not allege plausible grounds for relief.  *Lusmat v. Papoosha*, No. 3:20-CV-01386 (JAM), 2021 WL 3206843, at *1-6 (D. Conn. July 29, 2021) (the "IRO").  The IRO also dismissed all claims as alleged against the defendants in their official capacities and denied all prayers for declaratory relief.  (IRO at 34).  And the IRO dismissed all claims brought pursuant to 42 U.S.C. §§ 1985 and 1986.[5]  (*Id.*).

After engaging in discovery, the parties consented to the undersigned's jurisdiction and the case was transferred to the undersigned on November 29, 2022.  (Doc. Nos. 101, 102).  On January 23, 2023, the defendants filed a motion for summary judgment on all remaining claims, (Doc. No. 105, *et seq.*), including a memorandum of law, (Doc. No. 105-1) ("Defs' MoL"), and a Local Rule 56(a)1 statement of facts.  (Doc. No. 105-3) ("Defs' 56(a)1").  On February 24, 2023, the plaintiff filed his opposition, (*See* Doc. No. 113, *et seq.*), a memorandum of law in opposition (*See id.*) ("Pl's MoL"), and a responding Local Rule 56(a)2 statement of facts in opposition, (Doc. No. 112) ("Pl's 56(a)2").  The plaintiff also submitted a statement of "Additional Material Facts" and a

---

[4] Though the plaintiff attempted to amend his complaint again over a year later, (*see* Doc. Nos. 80, 81), the Court (Merriam, J.) rejected these motions as futile on August 9, 2022.  (Doc. No. 84).  Therefore, for the purposes of resolving this motion for summary judgment, the Amended Complaint stands as the operative, verified complaint.

[5] The IRO also allowed the plaintiff the opportunity to pursue another 14th Amendment due process claim challenging the mixed sanctions imposed as a result of the guilty finding in connection with an April 2018 disciplinary report. (IRO at 35).  However, this claim was later dismissed.  (Doc. No. 36).

"statement of disputed issues."  (Doc. Nos. 112-1, 112-2).  On March 24, 2023, the defendants

filed their reply.  (Doc. No. 116) ("Defs' Reply").  The case is now ripe for adjudication.

## II.    FACTS

The general facts of this case are laid out in the Court's (Meyer, J.) thorough initial review

order.  *See generally Lusmat*, 2021 WL 3206843, at *1-6.  Accordingly, the Court recites only the

facts relevant to resolve each issue.  Such facts are drawn from the verified Amended Complaint,[6]

the parties' respective Local Rule 56 statements and attached evidence, and other admissible

evidence in the record.  These facts are undisputed unless otherwise noted.[7]

## III.    LEGAL PRINCIPLES

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R.

CIV. P. 56(a); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82 (2d

Cir. 2004).  The moving party bears the burden of proving that no genuine factual disputes exist.

*See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "When deciding a summary

judgment motion, a . . . court's function is not to weigh the evidence, make credibility

determinations or resolve issues of fact, but rather to determine whether, drawing all reasonable

inferences from the evidence presented in favor of the non-moving party, a fair-minded jury could

---

[6] "It is true that a verified complaint may serve as an affidavit for summary judgment purposes provided it meets the other requirements for an affidavit under Rule 56(e)."  *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).  Here, the plaintiff's amended complaint contained the necessary declaration that all facts asserted were made under penalty of perjury, sufficing the requirements of a verified complaint.  (*See* Am. Compl. at 17).  *See Simms v. Cuzio*, No. 3:21-CV-00492(SALM), 2022 WL 3107150, at *4 (D. Conn. Aug. 4, 2022) (construing the same language in a *pro se* complaint to count as a verified complaint for summary judgment purposes).

[7] Pursuant to D. CONN. L. R. 56, each party must propound and serve a Local Rule 56(a) statement of facts.  *See id.* at 56(a)(1). The rule requires each party to cite to competent, admissible evidence such as affidavits of competent witnesses, deposition testimony, responses to discovery requests, or other documents.  *Id.* at 56(a)(3).  "Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions[.]"  *Id.*

find in the non-moving party's favor." *Urbont v. Sony Music Entm't*, 831 F.3d 80, 88 (2d Cir. 2016) (quoting *Beatie v. City of New York*, 123 F.3d 707, 710–11 (2d Cir. 1997)) (quotation marks omitted) (alteration in original). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

"In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Vivenzio*, 611 F.3d at 106 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Put another way, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (citation and quotation marks omitted). However, a party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

In ruling on a motion for summary judgment, a court may consider "depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers or other materials." FED. R. CIV. P. 56(c)(1). Although the Court is permitted to rely solely on the cited materials, the Court "may consider other materials in the record." *See* FED. R. CIV. P. 56(c)(3).

Lastly, although the Court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000); *accord Carter v. Warden of Bridgeport Corr. Ctr.*, No. 3:20CV918 (KAD), 2021 WL 4952841, at *2 (D. Conn. Oct. 25, 2021).

## IV.   DISCUSSION

### A.   Exhaustion

The IRO allowed the plaintiff to proceed with three claims which the defendants now argue are barred from review on the merits because the plaintiff has failed to exhaust his administrative remedies for them under the PLRA and the relevant DOC grievance process.  (Defs' MoL at 3-9). The three claims are: (1) an unsanitary conditions of confinement claim against defendant Medina; (2) a claim predicated on the denial of marriage against defendants Mudano and Chevalier; and (3) a due process claim in connection with the plaintiff's placement in a certain Security Risk Group upon his return to pre-trial detainment in August 2018 and April 2019 against defendants Papoosha and White.  (IRO at 35).  The Court agrees with the defendants that the plaintiff failed to exhaust these claims.

1.     **Exhaustion Under the Prison Litigation Reform Act (PLRA)**

The PLRA governs civil actions brought by prison inmates and pretrial detainees alike.[8]

The PLRA requires a pre-trial detainee to exhaust administrative remedies prior to filing a federal

lawsuit regarding prison conditions.  42 U.S.C. § 1997e(a).  *See Saeli v. Chautauqua Cnty.*, NY,

36 F.4th 445, 453 (2d Cir. 2022).  Failure to exhaust is an affirmative defense under the PLRA.

42 U.S.C. § 1997e; *Jones v. Bock*, 549 U.S. 199, 217 (2007).  Accordingly, a defendant bears the

burden to prove that an inmate did not exhaust his or her remedies prior to filing the action in court.

*See Johnson v. Mata*, 460 Fed. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of

showing that there is no genuine issue of material fact as to exhaustion that would preclude

summary judgment.").  However, "[o]nce the defendants establish that administrative remedies

were not exhausted before the inmate commenced the action, the plaintiff must establish that

administrative remedy procedures were not available to him under *Ross*, or present evidence

showing that he did exhaust his administrative remedies." *Gamble v. Garcia*, No. 3:20-CV-1273

(KAD), 2021 WL 3773305, at *5 (D. Conn. Aug. 25, 2021). *See Zulu v. Barnhart,* No. 916-CV-

1408MADDEP, 2019 WL 2997226, at *5 (N.D.N.Y. Apr. 22, 2019) (concluding that, though the

burden of proof on this affirmative defense remains with the defendant at all times, the plaintiff

can be required to produce evidence in order to defeat it), *report and recommendation adopted*,

No. 916-CV-1408MADDEP, 2019 WL 2150628 (N.D.N.Y. May 17, 2019).

As to scope, the PLRA applies to all inmate suits regarding prison life "whether they

involve general circumstances or particular episodes," *Porter v. Nussle*, 534 U.S. 516, 532 (2002),

---

[8] "The Court notes that, where the term 'inmate' or 'prisoner' is used in the exhaustion context, it applies equally to pretrial detainees." *Simms*, 2022 WL 3107150, at *6 n.4 (D. Conn. Aug. 4, 2022).  *See Dickinson v. York*, 828 F. App'x 780, 782 (2d Cir. 2020) (finding that pretrial detainee was required to exhaust administrative remedies under PLRA); *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 173 (2d Cir. 2006) (same).

and it requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim is not properly exhausted until the inmate complies with all administrative deadlines and critical procedural rules. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *accord Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). Thus, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford*, 548 U.S. at 83–84). *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("It is not sufficient for a plaintiff to exhaust his administrative remedies after filing his complaint; a plaintiff must exhaust his administrative remedies prior to filing the action in federal court."), *overruled on other grounds*, *Porter*, 534 U.S. 516; *accord Gulley v. Bujnicki*, No. 3:19-CV-903 (SRU), 2019 WL 2603536, at *3 (D. Conn. June 25, 2019). Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement. *See Marcias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). In sum, the consequences of non-compliance are strict; if the deadline to file a grievance has passed, an unexhausted claim is generally barred from federal court. *See Woodford*, 548 U.S. at 95

However, a failure to exhaust administrative remedies may be excused when the remedy is not "available" in practice even if it is "officially on the books." *See Ross v. Blake*, 578 U.S. 632, 643, 136 S. Ct. 1850, 1859, 195 L. Ed. 2d 117 (2016). This means that "an inmate is required to exhaust those, but only those, grievance procedures that" are actually available to them, that is, that "are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth*, 532 U.S. at 736, 738). In *Ross*, the Supreme Court identified at least three circumstances in which an inmate's failure to exhaust may be excused: (1) "when (despite what regulations or

guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 43-44; *accord Romano v. Ulrich,* 49 F.4th 148, 153 (2d Cir. 2022). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted).

Notably, post-*Ross*, the Second Circuit has "reiterated" that "*Ross*'s three circumstances are not 'exhaustive'" of all the circumstances in which an administrative remedy can be considered "unavailable." *Romano*, 49 F.4th at 155 (quoting *Rucker v. Giffen*, No. 20-1318, 2021 WL 1803655 (2d Cir. May 6, 2021)).

## 2.    Administrative Directive 9.6[9]

The exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (citations omitted). Here, the DOC's Administrative Directive ("A.D.") 9.6 sets out the applicable policy and procedures governing "Inmate Administrative Remedies."

A.D. 9.6 "provide[s] a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority[.]" A.D. 9.6(1). The type of remedies available to an inmate depends on the nature of the issue or condition experienced by the inmate or the decision made by correctional personnel. *See* A.D. 9.6(4)

---

[9] Defendants have submitted the relevant version of Administrative Directive 9.6 as Exhibit A to the Declaration of Matthew Beizer (Doc. No. 105-4). (*See also* Doc. No. 105-1 at 5).

(delineating the remedies available for certain types of grievances).  *See also Riles v. Buchanan*, 656 F. App'x 577, 579-80 (2d Cir. 2016) (describing requirements of A.D. 9.6).

As relevant here, the plaintiff's claims involving unsanitary conditions of confinement and denial of marriage are governed by the procedure listed in A.D. 9.6(6) as these grievances are not otherwise "specifically identified" in the relevant taxonomy set out in A.D. 9.6(4).  *See Otero v. Purdy*, No. 3:19-CV-01688 (VLB), 2021 WL 4263363, at *6 (D. Conn. Sept. 20, 2021) (citing *Wilson v. McKenna*, 661 F. App'x 750, 753 (2d Cir. 2016)) ("A plaintiff with claims concerning custody staff's deliberate indifference to his health and safety in his conditions of confinement or use of excessive force is generally obligated to exhaust his administrative remedies under Administrative Directive 9.6.[(6)]").  However, as to the plaintiff's claims regarding his SRG placement, "A.D. 9.6 also provides specific [and different] procedures for appealing SRG designations," which are detailed at A.D. 9.6(9).  *Martinez v. Payne*, No. 3:20-CV-00231 (JAM), 2021 WL 3493616, at *3 (D. Conn. Aug. 7, 2021).  Accordingly, the Court reviews exhaustion of the claims under their relevant subsection.

### 3.    Plaintiff's Conditions of Confinement Claim and Denial of Marriage Claim

Administrative Directive 9.6(6) requires an aggrieved inmate to first seek informal resolution prior to filing a grievance.  A.D. 9.6(6)(A).  It further provides that "the inmate shall submit a written request via CN 9601, Inmate Request Form," in the event that "the verbal option does not resolve the issue."  *Id*.  Administrative Directive 9.6(6)(C) specifically states that the inmate must include a copy of the Inmate Request Form (CN 9601) with the grievance (CN 9602), or an inmate must explain its absence.  *Id.*

The Level-1 Grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the Grievance and should include a copy of the response

to the written request to resolve the matter informally or explain why the response is not attached. A.D. 9.6(6)(C). The Unit Administrator shall respond in writing to the Level-1 Grievance within thirty business days of his or her receipt of the Grievance. *See* A.D. 9.6(6)(I). The inmate may appeal the disposition of the Level-1 Grievance by the Unit Administrator or the Unit Administrator's failure to dispose of the grievance in a timely manner to Level 2. A.D. 9.6(6)(G), (I) & (K). A grievance returned without disposition due to a failure to comply with procedural requirements of Administrative Directive 9.6 may not be appealed. *See* A.D. 9.6(6)(G).

As an initial matter, the defendants have not put forth any argument or evidence that any of the plaintiff's grievances as to these issues were in fact untimely or procedurally noncompliant, and the Court does not have that evidence before it. Rather, the defendants' contention is that the plaintiff purportedly admitted his inability to exhaust in his interrogatory responses, and thus his claims are barred. (Defs' 56(a)1 at ¶ 3; Defs' MoL at 6-7; Doc. No. 105-5 ("Beizer Decl.") ¶ 4). The plaintiff objects, arguing that this argument misreads his responses, which claim that his ability to exhaust was repeatedly "thwarted" by Grievance Coordinator Saunders ("Saunders"), implicating the third *Ross* circumstance of machination and intimidation.[10] (*See* Pl's 56(a)2 at ¶ 3; Doc. No. 112-2 ¶ 1). The defendants rejoin that this argument cannot stand because the plaintiff was successful in filing other grievances during the relevant time periods. (*See* Defs' MoL at 7; Defs' Reply at 3).

For the purpose of this motion, the Court accepts the defendants' premise that, according to the plaintiff's interrogatory responses, he did not file a grievance and therefore exhaust his

---

[10] Additionally, no party disputes that A.D. 9.6 provides an official, "on the books" grievance procedure generally available to inmates. *Ross*, 578 U.S. at 635, 136 S.Ct. 1850. Nor do the parties argue that either of the first two *Ross* circumstances—grievance procedures that operate in effect as a "dead end" or are so "opaque" as to be unavailable— are implicated here. *Id.* at 643-44.

administrative remedies. The Court also agrees with the plaintiff that the defendants initially mischaracterized his interrogatory responses and that they clearly implicate the third *Ross* consideration. (*See generally* Doc. No. 105-6 at 5-6). Further, the defendants acknowledge that the responses potentially implicate "unavailability" under *Ross*. (Defs' Reply at 3) (disputing availability of grievance process). Thus, the issue before the Court is whether the plaintiff has created a triable issue of material fact under the third *Ross* consideration that could potentially warrant excusal for his noncompliance.

The plaintiff generally contends both in his interrogatory response and in a putatively notarized letter[11] authored by him that "Grievance Coordinator Saunders thwart[ed] [his] access to the grievance systems" regarding the unsanitary conditions of confinement and denial of marriage rights claims. (Doc. No. 105-6 at 1, 5; Doc. No. 105-6 at 6). The plaintiff alleges Saunders has been "misrepresenting the Administrative [remedies] and its mechanism and thwarting my access to them" and details prior conduct by Saunders in which she would return grievances to the plaintiff and have him re-write them even after he had corrected deficiencies in them multiple times. (Doc. No. 105-6 at 6). The plaintiff also describes a "most recent" incident regarding a different grievance involving medical treatment and recreation requests in which, even after rewriting the grievance on Saunders's request, Saunders told the plaintiff she never received it despite the plaintiff averring that he put the grievance in the "administrative Remedies box myself on the way to the phone." *Id.* The letter continues that the plaintiff had "been having this

---

[11] Both parties have submitted identical copies of the letter. The defendants' copy is attached as part of the exhibit containing interrogatories and responses, (Doc. No. 105-6), while the plaintiff's copy contains just the letter alone. (Doc. No. 113-1). For the purposes of this motion, the Court only cites to the copy submitted by the defendants. While the plaintiff asserts that the letter was notarized in prison by Officer Ortiz—and indeed appears to be signed by him—there is no notary stamp present. Nonetheless, this fact does not bar the Court from considering the letter on summary judgment either as a response to an interrogatory to which it was attached, *see* FED. R. CIV. P. 56(c)(1), or as a "other material" relevant to the record. FED. R. CIV. P. 56(c)(3). Further, both the plaintiff and Officer Ortiz may testify and authenticate the letter at trial, and the defendants do not argue that it would be otherwise inadmissible.

problem with [Saunders] for almost a year now and I've spoken to her about it but it still happens" and that she was "trying to discourage us from writing things up."

Despite this evidence, the plaintiff fails to raise a genuine issue of fact as to the availability of the grievance procedure for his claims of unsanitary conditions of confinement and denial of marriage for several reasons.

First, Lusmat's own evidence fails to show specifically how any alleged misconduct by Saunders actually kept him from writing or filing grievances regarding his claims here. (*See* Defs' Reply at 2). Indeed, the plaintiff's letter indicates that any obstructive conduct related to entirely unrelated medical and recreational complaints, not his denial of marriage or conditions of confinement claims. (*See* Doc. No. 105-6 at 6). Ultimately, the plaintiff's briefing merely asserts that "something out of the ordinary occurred to make me not finish the grievance procedure" and attributes that to "Saunders thwart[ing his] access to the procedure." (Pl's MoL at 3). At summary judgment, and construing inferences in the plaintiff's favor, this is not enough. Lusmat cannot "rely on conclusory allegations or unsubstantiated speculation" but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks and citation omitted). *See Gottlieb*, 84 F.3d at 518 (non-moving parties cannot defeat summary judgment by relying on allegations in the pleadings, conclusory statements, conjecture or surmise) (citation omitted). If anything, Lusmat "could have re-filed his grievance or sought to 'appeal' his grievance when he did not hear back from" Saunders or another grievance officer.  *See Smith v. City of New York*, No. 12 CIV. 3303 CM, 2013 WL 5434144, at *20 (S.D.N.Y. Sept. 26, 2013) ("[The plaintiff] could have re-filed his grievance or sought to 'appeal' his grievance when he did not hear back from the Grievance Office within five days after filing the initial grievance"); *Mckinney*, 170 F.

Supp. 3d at, 517 ("Further, Plaintiff's assertions that Ms. Bartlett refused to process his grievances did not render the entire grievance process unavailable, as Plaintiff could have re-filed any grievance or sought to appeal his grievance when he did not receive a favorable response after attempting to file his initial grievance.").  Ultimately, the plaintiff makes no allegations in his Amended Complaint or his letter "that anyone or anything prevented him from filing grievances related to *these two* incidents."  *Davis v. Grant*, No. 15-CV-5359 (KMK), 2019 WL 498277, at *8 (S.D.N.Y. Feb. 8, 2019) (emphasis added) (entering summary judgment for defendants on issue of exhaustion).

Second, the defendants have submitted evidence in the form of grievances logs that show that the plaintiff was able to submit at least twenty grievances between October 21, 2019, and January 8, 2021.  (Doc. No. 116-1 ¶¶ 7-8).  This includes at least one grievance filed in November 2019, two weeks after he was told (a second time) that he could not get married, and two grievances filed within weeks after his placement in the alleged unsanitary conditions of confinement on May 8, 2020.  (*See id.*).  Courts in this district and Circuit have routinely found that an inmate's ability to file grievances during the time period alleged to be "unavailable" precludes a finding of "unavailability" under *Ross*.  *See, e.g.*, *Gamble v. Garcia*, No. 3:20-CV-1273 (KAD), 2021 WL 3773305, at *5 (D. Conn. Aug. 25, 2021) (granting summary judgment on failure to exhaust and relying, in part, on "the fact that [the plaintiff] did file grievances during this period shows that the grievance process was available to him"); *Dowling v. Barkman*, No. 917-CV-647MAD-DJS, 2019 WL 7971868, at *5 (N.D.N.Y. Dec. 20, 2019) (finding "no basis [] on the record for concluding that DOCCS' grievance procedure was unavailable" to the plaintiff where the "Plaintiff did pursue a grievance . . . during the same time period at issue here which demonstrates that the grievance process was available to him"), *report and recommendation adopted sub nom. Dowling v.*

*Schleicher*, No. 917-CV-0647MAD-DJS, 2020 WL 103480 (N.D.N.Y. Jan. 8, 2020); *Masas v. Conte*, No. 9:13-CV-617 GLS/ATB, 2015 WL 1800482, at \*6 (N.D.N.Y. Apr. 16, 2015) (no *Ross* exception found where "plaintiff admitted during his deposition that the grievance process was available to him, which was corroborated by the fact that he filed five grievances . . . during the relevant time period"); *Black v. Fischer*, No. 12 Civ. 2341, 2013 WL 1314940, at \*8–9 (S.D.N.Y. Mar. 28, 2013) (the plaintiff's claim that he was deterred from pursuing grievances by threats from a defendant was overcome by the fact that plaintiff filed other grievances and complaints during the relevant time period). *But see Zulu v. Barnhart*, No. 916-CV-1408MADDEP, 2019 WL 2997226, at \*13 (N.D.N.Y. Apr. 22, 2019), *report and recommendation adopted*, No. 916-CV-1408MADDEP, 2019 WL 2150628 (N.D.N.Y. May 17, 2019) (a "plaintiff's understanding of how the [administrative] process functions in the ordinary course bolsters his claim that the usual process did not unfold in this circumstance by suggesting that the filing failure did not result from plaintiff's own ineptitude").

In sum, Plaintiff has "failed to provide any legitimate excuse for his failure to file any grievances related to" his conditions of confinement claim and his denial of marriage claim. *Mckinney v. Prack*, 170 F. Supp. 3d 510, 518 (W.D.N.Y. 2016). Accordingly, the defendants' motion for summary judgment as to the plaintiff's failure to exhaust these two claims is **GRANTED**. The Court hereby **DISMISSES with prejudice** the plaintiff's (1) unsanitary condition of confinement claim against defendant Medina and (2) the denial of marriage claim against defendants Mudano and Chevalier.

### 4.    Plaintiff's Procedural Due Process Claim Regarding SRG Placement

The IRO allowed the plaintiff to pursue procedural due process claims against defendants Papoosha and White, both of whom are SRG coordinators, in connection with the plaintiff's

readmission into the SRG Phase One in both August 2018 and April 2019 as a pretrial detainee. IRO at 26-27.[12]   In brief, the plaintiff maintains that the defendants improperly placed him in SRG's Phase One – the most restrictive phase – when he had been previously discharged in Phase Two – a less restrictive phase – and that this decision was made without notice or a hearing in violation of his due process rights and prison policy.   *Id.* (*See* Doc. No. 7 at 6) (March 18, 2020, Administrative Grievance).   Specifically, in his briefing, the plaintiff argues that he "never received a 'notice of designation'" of his Phase One status because he did not receive a "ticket" or a CN61404 form as required by A.D. 6.14, the directive which establishes, *inter alia*, policies regarding the designation process of inmates to Security Risk Groups.   The plaintiff contends this failure of process excuses his untimely filing.[13]   (Pl's MoL at 5-8; Doc. No. 112-1 ¶ 8; Doc. No. 7 at 6).   *See* A.D. 6.14(7)(A).   The defendants argue that this claim is procedurally forfeited under the PLRA as the plaintiff failed to file timely appeals in connection with his placement in Phase One on both occasions.   (Defs' MoL at 7-9; Defs' Reply at 3-5).   The Court agrees with the defendants and finds Lusmat's argument without merit.

The defendants have submitted the plaintiff's Level 1 grievance form (Form CN 9602) in which he raises complaints with his SRG phase placement upon his readmissions in November 2018 and April 2019.   (*See* Beizer Decl. ¶¶ 7-8; Doc. No. 105-9 at 3-4; Doc. No 113-7; Doc. No. 7 at 6).   This grievance is dated March 18, 2020 – eleven months after his later April 2019 Phase 1 designation.   While there may be some ambiguity as to which A.D. should control the timing of his appeal,[14] that determination is irrelevant to disposing of this claim because in no case would

---

[12] The IRO dismissed this claim against defendant Warden Mudano for lack of personal involvement.  *See* IRO at 27.

[13] A copy of A.D. 6.14 was provided by the defendants. (*See* Doc. No. 105-10).

[14] The defendants argue that Lusmat improperly "attempted to present his appeal through the [generalized] grievance process" covered in A.D. 9.6(6), which would have allowed him thirty (30) calendar days from the "occurrence or discovery of the cause of the grievance."  A.D. 9.6(6)(C).  (Defs' Reply at 5).  The defendants cite to A.D. 9.6(9) as

the plaintiff have had more than thirty days to file an appeal or other grievance, which he plainly did not do.  Lusmat was clearly on notice of his SRG member status and phase placement when he, as he admits, was sent directly to Phase One upon both readmissions to Northern Correctional Institution ("Northern").  (*See* Pl's MoL at 5-6; Doc. No. 113-7).  *See cf. Martinez v. Payne,* No. 3:20-CV-00231 (JAM), 2021 WL 3493616, at *4 (D. Conn. Aug. 7, 2021) ("Indeed, even if the 'discovery of the cause of the grievance' language [in the DOC prisoner handbook] applied to appeals of SRG designations, Martinez would have discovered the cause—that his due process rights were allegedly violated—at the same time the SRG designation occurred in December 2018.").  Thus, given his admitted and established familiarity with the grievance system regulations, and taking any ambiguity in his favor, he nonetheless should have filed a timely grievance.  (*See* Pl's MoL at 3 ("I've filed multiple grievances and know exactly how to do so")).  *See also Martinez*, 2021 WL 3493616, at *5 (accepting even if the plaintiff "did not know of the procedure to appeal his SRG designation, courts in this circuit have found in light of the Supreme Court's decision in *Ross* that grievance procedures are not 'unavailable' simply because a plaintiff was unaware of the existence of the procedure").  "Proper exhaustion of administrative remedies 'demands compliance with an agency's deadlines[.]'" *Lexis v. Bellemare*, No. 3:18-CV-1403 (JAM), 2020 WL 7043128, at *7 (D. Conn. Nov. 30, 2020) (quoting *Woodford*, 548 U.S. at 90) (dismissing claim regarding SRG placement for failure to comply with deadlines where plaintiff did not file an appeal until "more than a month after the deadline").  Because Lusmat failed to

---

the proper avenue, which would have allowed Lusmat only fifteen (15) calendar days after "notice of designation" to an SRG group to appeal his designation  *See id.* (Defs' Reply at 5).  However, by that subsection's own terms, this deadline only appears to apply to appeals of "*initial*" SRG designations.  *See id.* (emphasis added).  Lusmat had previously been designated, discharged, and readmitted as an SRG member so this section is likely inapplicable.  In any event, as discussed above, the Court need not resolve the issue to adjudicate the ultimate issue of exhaustion as to this claim as Lusmat's appeal was untimely filed under either subsection.

submit timely grievances,[15] summary judgment in favor of the defendants is warranted on this ground.

Lusmat's argument that he was owed a notification pursuant to A.D. 6.14 does not change this analysis.   While it is true that A.D 6.14(7) requires that "form CN61401, Notice of Security Risk Group Hearing Notification, and page one of CN 61402, Security Risk Group Determination shall be provided as notice to the inmate," this subsection, by its own terms, appears only to apply to an inmate's initial "designation" as an SRG member—that is, the first time DOC determines that, under that regulation, the inmate belongs to a "group of inmates . . . which as a discrete entity, jeopardize the safety of the public staff or other inmate(s)."  A.D. 6.14(3)(H).  This reading is confirmed by the fact that A.D. 6.14(18) separately provides procedures for those inmates who have *already* been designated as SRG members previously and who have subsequently been released and then readmitted in DOC custody.  *See id.* at (18) (governing "Readmission" of inmates discharged SRG members).   The section of A.D. 6.14 that serves as the basis for Lusmat's substantive claim[16] does not require that he have been given written notice of the readmission designation because he had *already* been designated as an SRG member prior to his discharge. Lusmat's own grievances confirm this was the case, (*See* Doc. No. 105-9), and defendant Papoosha's interrogatory responses corroborate that a "ticket" was not required. (*See* Doc. No. 105-7 ("Papoosha IROG"), ¶ 4 ("Inmate doesn't need to receive a [Disciplinary Report] for Phase-

---

[15] Further, Lusmat's claims contained in his March 18, 2020, Level 1 grievance that he talked to defendant Papoosha and submitted over five "request forms" without support of admissible evidence are not enough to create a genuine dispute of material fact as to whether he actually filed timely grievances. *See Otero v. Purdy*, No. 3:19-CV-01688 (VLB), 2021 WL 4263363, at *4 (D. Conn. Sept. 20, 2021) ("[W]here the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.") (citation omitted).  (*See* Doc. No. 113-7 at 1)

[16] Lusmat argues that he was discharged from DOC custody in Phase Two and then improperly assigned to Phase One, a more severe SRG phase, upon each readmission to DOC in contravention to A.D. 6.14(18)'s mandate that discharged SRG members be "readmitted on the same status."  *Id.* (*See* Pl's MoL at 6).

1 placement.")).  Instead, A.D. 6.14(17) affords readmitted pretrial detainees like Lusmat a status

review "within ninety days."  *Id.*  Evidence adduced by the defendants shows that he received such

reviews.[17]  (*See* Doc. No. 105-8; Papoosha IROG ¶¶ 1-2, 18, 24).

As the plaintiff's grievance was undisputedly untimely, and he has not raised any other

factual matter establishing that DOC's grievance and appeals procedures were otherwise

unavailable to him, the Court **GRANTS** the defendants' motion for summary judgment and

**DISMISSES with prejudice** the plaintiff's procedural due process claim regarding his SRG

placement against defendants Papoosha and White.

### B.      The Plaintiff's Remaining Claims

The defendants do not raise the issue of exhaustion on the following three claims: (1) a

procedural due process claim; (2) a First Amendment claim; and, (3) a deliberate indifference to

safety claim.  Therefore, the Court reviews these claims on the merits.

---

[17] The defendants submitted 90-Day Notification and 90-Day Review forms dated and signed by Lusmat on November 15, 2018, apparently the same day after his readmission to DOC.  (Doc. No. 105-8 at 1-2; Doc. No. 105-9 at 15). These 90-Day Review Forms both state, "You may appeal this designation . . . within 15 days of the receipt of this notification in accordance with Administrative Directive 9.6.").  (Doc. No. 105-8 at 1-2).  The defendants also submitted the 90-Day forms showing that a 90-Day review hearing was held either on April 12 or 17, 2019, at least a day after his readmission on April 11, 2019, and that Lusmat refused to sign the forms.  (Doc. No. 105-8 at 3-4; Papoosha IROG. ¶ 19) (*See* Am. Compl. ¶ 16; IRO at 5).  The plaintiff claims that he "find[s it] hard to believe" that he would acknowledge the 90-Day review forms and/or refuse to sign them and alleges that "DOC has been known to forge signatures for whatever reason." (Pl's MoL at 5).  While the signatures on the 90-Day Review forms for 2018 indeed appear different from Lusmat's signature on his other grievances, (*compare* Doc. Nos. 113-5, -6, -7, *with* Doc. No. 105-8 at 1-2), the 2019 90-Day Review forms affirm that Lusmat refused to sign them.  (Doc. No. 105-8 at 3-4). His failure to file a grievance until over fifteen months later renders moot any potential factual issue regarding the veracity of the signatures on the 2018 forms.

### 1. Procedural Due Process at the June 2020 Hearing[18]

The IRO permitted the plaintiff to proceed on a procedural due process claim alleging that defendants Tugie and Riccio deprived him of assistance of an advocate or prison counselor at his June 2020 Administrative Segregation ("AS") hearing.  (IRO 28-29) (*See* Doc. No. 112-2 at ¶¶ 7-8) (stating that an issue on summary judgment is "whether the Plaintiff's due process was violated by not getting legal aid from an advisor for a[n] administrative segregation hearing").  This claim is without merit.

To prevail on a Fourteenth Amendment procedural due process claim, a plaintiff "must be able to demonstrate (1) that Defendants deprived him of a cognizable interest in life, liberty, or property, (2) without affording him constitutionally sufficient process."  *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citations and quotation marks omitted); *accord Simms v. Cuzio,* No. 3:21CV00492(SALM), 2022 WL 3107150, at *11 (D. Conn. Aug. 4, 2022).  More specifically, "[t]o succeed on a Section 1983 claim 'for denial of due process arising out of a disciplinary hearing, a plaintiff must establish that he (1) possessed an actual *liberty* interest and (2) was deprived of that interest without being afforded sufficient process.'"  *Eckert v. Grady*, No. 3:19-CV-982 (VAB), 2020 WL 3129478, at *7 (D. Conn. June 12, 2020) (quoting *Williams v. Chuttey*, 767 F. App'x 105, 107 (2d Cir. 2019)) (emphasis added).

---

[18]  It is axiomatic in a § 1983 case that the plaintiff must adduce some evidence at the summary judgment stage that each defendant named as to a certain claim "was personally involved in the alleged constitutional violation."  *See Singletary v. Russo*, 377 F. Supp. 3d 175, 185 (E.D.N.Y. 2019) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)) (opining that personal involvement is a "fundamental inquiry in a § 1983 case").  While neither party raises the issue here, there is undisputed evidence that both defendants were personally involved in the June 2020 hearing. (*See* Doc. No. 105-12 at 9, 8) (an administrative segregation log entry showing defendant "CS Tugie" to be the hearing officer and defendant "CC Riccio" as being the "Recrdr").

As to the first prong, the defendants "do not concede" that a cognizable liberty interest was implicated once the plaintiff was put in administrative segregation.[19]  (Defs' MoL at 11-12).  The defendants nonetheless argue that even if this were the case, Lusmat was afforded all the process he was due at the hearing in terms of assistance and presenting his case.  Construing the claim in the light most favorable to Lusmat and accepting for the purposes of this motion that he has stated a deprivation of liberty, the Court also finds that the claim has no merit as there is no genuine dispute that Lusmat was afforded all the process that was due under the Constitution.  *See Alston v. Cahill*, No. 3:07-CV-473 RNC, 2012 WL 3288923, at *3 (D. Conn. Aug. 10, 2012) (opining that the Court need not "delve into a detailed factual inquiry to determine whether the plaintiff's [conditions of] administrative segregation" invaded a "protected liberty interest, [because] he was afforded all the process he was due under the Constitution").

Turning to the merits of the second prong, *i.e.*, what process was due, the parties agree that a pretrial detainee who is placed in "administrative segregation pending a completion of a misconduct investigation must [] receive some notice of the charges against him and an opportunity to present his views."  *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001).  (*See* Defs' MoL at 12) (citing *id.*).  *Accord Hewitt v. Helms*, 459 U.S. 460, 476, 103 S. Ct. 864, 874, 74 L. Ed. 2d 675 (1983).  Lusmat's papers raise no argument that he was not afforded this proper

---

[19] The plaintiff alleges he was confined in administrative segregation for "23 hours a day . . . Monday through Friday, 24 hours on the weekend, 3 showers a week, and 1 call a week," and that these conditions stand as cognizable deprivation of liberty because they imposed an "atypical and significant hardship."  (Pl's MoL at 10-11) (citing Doc. No. 113-16).  *See Alston v. Cahill*, No. 3:07-CV-473 RNC, 2012 WL 3288923, at *3 (D. Conn. Aug. 10, 2012) ("[I]f an inmate in a [] prison experiences atypically harsh confinement in administrative segregation, he must receive due process.").  However, both the plaintiff and the defendants rely on this erroneous standard, which covers *sentenced* inmates.  *See Sandin v. Conner*, 515 U.S. 472, 475, 483-84, 115 S. Ct. 2293, 2300, 132 L. Ed. 2d 418 (1995)) (distinguishing between the standards applied to pretrial detainees and convicted prisoners).  A pretrial detainee's liberty interest is governed by the 14th Amendment's "punishment" standard, and thus a pretrial detainee "need not prove that the conditions under which he was confined exposed him to atypical and significant hardships in order to demonstrate a liberty interest requiring procedural due process protection." *Eckert v. Grady*, No. 3:19-CV-982 (VAB), 2020 WL 3129478, at *8 (D. Conn. June 12, 2020).   *See Bell v. Wolfish*, 441 U.S. 520, 534 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("Under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001).

notice or opportunity to present his views.  Rather, the gravamen of Lusmat's due process claim here—as construed from his verified Amended Complaint and his briefing—is that he was deprived of the assistance of a preferred prison counselor at the administrative segregation hearing that took place in June 2020 and that his counselors were generally unprepared.  (*See* Am. Compl. ¶¶ 72-73, 75-76; IRO at 29).  The defendants agree that "an inmate confined to a restrictive housing unit does have the limited right to some assistance to marshal evidence and present a defense." (Defs' Reply at 6) (citing *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)).  *See Pagan v. Dougherty,* No. 3:18-CV-1668 (VLB), 2019 WL 2616975, at *7 (D. Conn. June 26, 2019)).  *See also Loving v. Selsky*, No. 07-CV-6393L (DGL), 2009 WL 87452, at *2 (W.D.N.Y. Jan. 12, 2009) (explaining that an "inmate's right to assistance in connection with a disciplinary hearing – [] arises under the Due Process Clause of the Fourteenth Amendment" and not under the Sixth Amendment).

The undisputed facts here show that the plaintiff was originally notified on June 15, 2020, that he was scheduled for an administrative segregation hearing on June 19, 2020.  (Doc. No. 105-11, ¶ 4 ("Tugie Decl."); Doc. No. 105-12 at 2 (CN 9402 form); Pl's 56(a)2 ¶ 10).  The form notifying him of the hearing (Form CN 9402) shows that the plaintiff's advisor of choice was a "C/O [Worlds[20]]" and that the plaintiff had requested the statements of three witnesses: Archer, Scozzari, and Squirewell.  (Doc. No. 105-12 at 2).  This form was also acknowledged and signed by a "Counselor Blue."  (*Id.*) (*See* Pl's MoL at 10) (Lusmat explaining he "asked Counselor Blue to do me a favor" "with those statements").  At some point between June 16th and 18th, each of these three witnesses ultimately wrote and signed statements on CN 9511/1 forms.  (*See* Pl's MoL

---

[20] The parties' submissions contain several different spellings of this officer's name, the Court adopts this one as it is the name reflected in DOC documentation for the purposes of this motion only.

at 10; Doc. Nos. 113-12, 113-13, 113-14; Doc. No. 105-12 at 3-6).  These statements were also signed by Counselor Blue.[21]  (*See id.*).

On June 19, 2020, defendant Tugie, who was the Counselor Supervisor in the Offender Classification and Population Management Unit, "realized that [] Lusmat had not met with his advisor CO Worilds" and accordingly the hearing "did not proceed" and was "rescheduled for June 26, 2020, to allow Lusmat to meet with his advisor."  (Tugie Decl., ¶¶ 2-4; Defs' 56(a)1 ¶ 10; Pl's 56(a)2 ¶ 10; Doc. No. 105-12 at 9; Pl's MoL at 10).  Lusmat himself acknowledges this turn of events, admitting that "from June 19, 2020, till my hearing June 26, 2020, I saw my advisor [Worilds] one time" but that Worilds "admitted [that] he didn't know what was doing" as an advisor.  (Pl's 56(a)2 at ¶¶ 10-11; Pl's MoL at 10; Tugie Decl. ¶ 5).  However, Lusmat admits that on June 23, he gave his "statement to [a different] Counselor . . . and she submitted it for me" but it was submitted without form CN 9511/1 attached.  (Pl's MoL at 10).[22]  Nonetheless, on June 29, 2020, the administrative segregation hearing was held, and defendants Tugie and Riccio presided.  (*See* Doc. No. 105-12 at 7, 9).  Lusmat states that he attended and was present at his hearing with a different counselor, Ortiz, who "had nothing to do with my hearing process."  (Pl's 56(a)2 at ¶ 11).  However, Lusmat does not dispute that both his own statement and his witnesses' statements

---

[21] Inexplicably, Scozzari's witness statement is written on lined paper and is dated June 16, 2020, while the CN 9511 cover form to which the statement was attached shows Counselor Blue signing its receipt on June 15—the day *before* the statement was written.  (Doc. No. 105-12 at 3-4).  While this ambiguity may raise questions about the date the statement was authored (and perhaps its veracity), it does not, by itself, change the conclusion that Lusmat was afforded the minimum due process at his administrative segregation hearing.

[22] The Court may consider statements in the plaintiff's sworn verified complaint.  *See* note 6, *supra*.  The Court may also "consider unsworn statements made in other documents" such as memoranda of law, "to the extent that they are based on Plaintiff's personal knowledge or are supported by other admissible evidence."  *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974 (KMK), 2017 WL 4326540, at *6 (S.D.N.Y. Sept. 28, 2017).  *See, e.g.*, *Shepherd v. Fischer*, No. 10-CV-1524, 2015 WL 1246049, at *8 n.22 (N.D.N.Y. Feb. 23, 2015) ("Although the allegations are contained in [the] plaintiff's unsworn memorandum of law in support of his opposition, courts in this circuit routinely consider such statements in connection with a motion for summary judgment where the proponent of the statements is a *pro se* litigant, mindful of the duty to extend special solicitude to those individuals.").

were actually introduced at the hearing. (Doc. No. 112, ¶ 13; Pl's MoL at 10). Ultimately, the hearing officers authorized administrative segregation. (*See* Doc. No. 105-12 at 7, 9).

On this record, the Court finds that the plaintiff was provided with all the process he was due under the Fourteenth Amendment. That is, he was provided "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation," and the hearing occurred "within a reasonable time following" his transfer to administrative segregation. *Taylor v. Comm'r of New York City Dep't of Corr.*, 317 F. App'x 80, 82 (2d Cir. 2009). Going to his specific complaints here, the evidence also establishes that defendants Tugie and Riccio explicitly allowed Lusmat additional time to meet with his advisor to prepare a defense; Counselor Blue secured and submitted three witness statements on Lusmat's behalf, another counselor submitted Lusmat's own statement; and, another counselor, Ortiz, was present with him at the hearing. The Court find that this procedure provided Lusmat with the limited "right to assistance in marshaling the evidence and presenting a defense." *Pagan*, 2019 WL 2616975, at *8 (citing *Eng*, 858 F.2d at 898).

Lastly, the Court has a duty to liberally construe Lusmat's papers to raise the strongest argument they may present, and it appears that Lusmat's submission also challenges the substantive adequacy of his prison counselors' assistance in helping him prepare a defense. (*See* Pl's MoL 11; Doc. No. 112-2, ¶ 8). "While a pretrial detainee has no right to retained or appointed counsel at a disciplinary hearing, in some circumstances, he or she may be entitled to the appointment of an advocate or assistance from a fellow inmate." *Friedland v. Otero*, No. 3:11CV606 JBA, 2014 WL 1247992, at *5 (D. Conn. Mar. 25, 2014) (citing *Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974)). Specifically, Lusmat cites to *Lee v. Coughlin* for the proposition that a prison "assistant" must be furnished prior to a hearing, and that assistant should have helped

24

him further with investigatory tasks and legal aid.  *Id.*, 902 F. Supp. 424, 433-34 (S.D.N.Y. 1995), *on reconsideration*, 26 F. Supp. 2d 615 (S.D.N.Y. 1998).  *See Rooks v. Santiago*, No. 3:20CV299 (MPS), 2022 WL 561412, at *13 (D. Conn. Feb. 24, 2022) (quoting *Elder v. McCarthy*, 967 F.3d 113, 129 (2d Cir. 2020)) (The "assigned assistant's precise role and the contours of the assistant's obligations" are not defined, but "[a]t a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.").

This claim likewise fails.  First, to the extent that Lusmat had an issue with the substantive adequacy of the assistance provided by Worlds, Blue, or Ortiz, he failed to name them as defendants in this action.  Second, to the extent Lusmat attempts to extend any of the counselors' alleged ineffective assistance to defendants Tugie and Riccio, it is well established that "[t]here is no supervisory liability for Section 1983 claims."  *See Madera v. Ezekwe*, No. 10 CV 4459 RJD LB, 2013 WL 6231799, at *16 (E.D.N.Y. Dec. 2, 2013) (citing *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir.2012)).  Lastly, Lusmat's reliance on to *Lee* is entirely inapposite to the facts here.  (*See* Pl's MoL at 11).  In *Lee*, the plaintiff was denied *any* assistance in preparing for his disciplinary hearing because he refused to cooperate with the designated assistant, who was not one of the assistants that the inmate had initially requested.  Here, Lusmat indeed met with Worlds, his requested counselor, prior to the rescheduled hearing.

Accordingly, and for the reasons stated above, the Court **GRANTS** summary judgment and **DISMISSES with prejudice** the procedural due process claim in connection with the June 2020 administrative segregation hearing against defendants Tugie and Riccio.

### 2.    First Amendment Claim Regarding Denial of a Book

The IRO allowed the plaintiff to pursue a First Amendment claim against defendants Laprey, Papoosha, and Warden Bowles after the DOC's Media Review Board ("MRB") denied

the plaintiff access to a book entitled the "Almighty Black P Stone Nation."  (IRO at 31).  The plaintiff generally contends the denial and confiscation of the book violated his First Amendment rights because its confiscation was not based on any legitimate penological interest.  *See Burns v. Martuscello,* 890 F.3d 77, 86 (2d Cir. 2018) ("A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.").  The defendants argue that the claim fails for a lack of any personal involvement of any of the named defendants, which is a threshold issue precluding liability in § 1983 cases.  (Defs' MoL at 18-19; Defs' Reply at 10).  *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (citation omitted).  The defendants further argue that, in any case, the rejection of the book by the MRB was "well founded" under the relevant prison regulation, A.D. 10.7,[23] because the book was related to specific gang "set" that had previously been labeled as "disruptive."  (Defs' MoL at 19). The Court takes each of the defendants' contentions in turn.

### a)      Personal Involvement

After review of the record, the Court cannot find any evidence that defendants Laprey or Warden Bowles had any personal involvement in the MRB's decision to deny Lusmat access to the book.  As to Laprey, the plaintiff has adduced no evidence in the record showing his involvement in the MRB decision regarding the book.  As to Warden Bowles, his name does indeed appear in the "CC:" line at the bottom of the decision letter sent to Lusmat, informing him of the MRB's decision to reject the book from entering the prison.  (*See* Doc. No. 105-16 at 2).  However, the mere receipt of the denial decision, without more, is not sufficient to establish personal

---

[23] A copy of A.D. 10.7 was submitted by the defendants.  (Doc. No. 107).

involvement in the actual denial decision itself. *See cf. Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 135–36 (2d Cir. 2013) ("Since there is no evidence that [the defendant] had any involvement in the promulgation or application of such a policy, he is entitled to qualified immunity"). *See also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (laying out the four instances in which a supervisory prison official could potentially be liable for constitutional violations, none of which are present or agued here). Thus, the Court **GRANTS** summary judgment and **DISMISSES with prejudice** the First Amendment Claim against defendants CO Laprey and Warden Bowles.

The same cannot be said of defendant Papoosha. It is well established in the Second Circuit that the personal involvement of a defendant may be shown by evidence "the defendant *participated directly* in the alleged constitutional violation[.]" *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (emphasis added); *Wright*, 21 F.3d at 501 (a "defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutionally protected [] interests" by having "directly participated in the infraction"). Put another way, "what [the Circuit has] meant by using phrases such as 'direct participation' as a basis of liability [in § 1983 actions] is personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted). Under this standard and on this record, it appears that that defendant Papoosha had "direct participation" with the decision to reject the book even though he was not technically a member of the MRB or a supervisor to the MRB Coordinator, Julie Kunkel, on paper. *Provost*, 262 F.3d at 155. The undisputed affidavit and email evidence submitted by the defendants themselves show that Papoosha was personally "consulted" by Kunkel in connection with the decision of whether to permit the book into the Prison. (Defs' MoL at 18-19; Def's 56(a)1 ¶¶ 26,

29; Doc. No. 105-15 ("Kunkel Decl.") at ¶¶ 7-10;  Doc. No. 105-16).  After Kunkel left a copy of

the Book on Papoosha's desk, Papoosha himself "went through" the book "a bunch" and ultimately

recommended that the book "should be rejected" "[e]ven though it's just the historical breakdown

of the Black P. Stones . . .  based on them being recognized in CT as being an off shoot of the

Bloods" gang.  (Doc. No. 105-16 at 1).  Papoosha further explained to Kunkel that "P. Stones were

on the Disruptive list in 2017 but were upgraded to SRG due to their Blood ties the following

year."  (*Id.*).  Further, the rejection letter and Kunkel's declaration both demonstrate – and indeed

openly admit – that Papoosha's recommendation and language was nearly taken verbatim in the

decision to reject the book.  (*See id.*) (DOC notice letter explaining that, in upholding the MRB's

decision to reject it, the book was "forwarded to the SRG Unit for further review" and that  "[t]he

Black P Stones are recognized in CT as being an off shoot of the SRG Bloods. Additionally, they

were on the Disruptive list in 2017 but were upgraded to a SRG due to their Blood ties the

following year."); Kunkel Decl. ¶ 10 ("Based on the information from Mr. Papoosha, the MRB

decided the publication should be rejected.").

    In short, Papoosha's direct input regarding the book was sought out by Kunkel prior the

MRB's issuing its rejection; Papoosha read the book; Papoosha wrote an email to Kunkel in which

he recommended denying the book for various institutional reasons he believed were legitimate;

his reasoning—and even his language—was subsequently adopted in the MRB's rejection letter

to Lusmat; and, ultimately, Kunkel herself admitted the decision to reject the was based "in part"

on Papoosha's expertise.  (*See* Doc. No. 105-1 at 18-19; Def's 56(a)(2) ¶¶ 26, 29; Kunkel Decl. at

¶ 10; Doc. No. 105-16).  Thus, the Court finds that defendant Papoosha was personally and directly

involved with the alleged constitutional violation.

b)      **First Amendment Violation**

With the issue of defendant Papoosha's personal involvement settled, the Court turns to the merits of the plaintiff's claim, *i.e.*, whether the decision to reject the book violated the plaintiff's First Amendment rights.  Here, the defendant's sole proffer on the merits is that the MRB's decision to reject the book was "well founded."  (Defs' MoL at 19; Defs' Reply at 11). While this conclusory statement in the defendants' briefing is unsupported by any legal argument or citation, the Court's own review under the deferential test set out in *Turner v. Safly* leads it to the conclusion that, on summary judgment, the plaintiff has failed adduce evidence to create a triable issue of material fact.  *See id.*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2262, 96 L. Ed. 2d 64 (1987) ("*Turner*").  Accordingly, for the reasons discussed below, the Court grants summary judgment to defendant Papoosha on this claim.

As an initial matter, pretrial detainees, like sentenced incarcerated persons, still retain First Amendment rights while in prison.  *See Burns,* 890 F.3d at 86.  However, the full protection of those rights generally afforded by the First Amendment may necessarily be curbed by those generally applicable and neutral prison regulations that are consistent with "legitimate penological objectives of the corrections system."  *Id.  See Turner v.* 482 U.S. at 89 ("[T]here must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it").  Specifically, as it concerns incoming publications and mail, a "pre-trial detainee has rights under the First Amendment to receive communications from the outside world, but these rights are subject to the interests of prison officials in maintaining discipline and security." *O'dell'bey v. Mulligan*, No. 3:19-CV-00691 (JAM), 2019 WL 2491630, at *3 (D. Conn. June 14, 2019).  *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) ("A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."); *Burns*, 890 F.3d

at 88 (First Amendment rights are "subject to significant limitation in light of countervailing interests within the correctional system.").

"The governing standard" of how First Amendment limitations may be imposed  in the prison setting "is one of reasonableness." *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004). Generally, a court's determination of such "reasonableness" involves analyzing the challenged regulation under the following four-part *Turner* test: (1) whether the policy or regulation is "reasonably related to legitimate penological interests"; (2) whether "there are alternative means of exercising the right that remain open"; (3) "the impact that accommodation of the asserted constitutional right will have on guards and inmates"; and (4) whether "ready alternatives" in prison policy that would accommodate the right exist, indicating that the policy is "an exaggerated response to prison concerns." *Turner*, 482 U.S. at 89-91 (internal citations and punctuation omitted); *accord Burns*, 890 F.3d at 87. *See Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S. Ct. 1874, 1881, 104 L. Ed. 2d 459 (1989) (holding that "regulations affecting the sending of a 'publication' . . . to a prisoner must be analyzed under the *Turner* reasonableness standard.").

Here, however the plaintiff does not challenge the prison's incoming-mail policy, A.D. 10.7, itself. [24]  Rather, the plaintiff challenges the defendant's individualized and discrete decision to deny him access to the specific book pursuant to A.D. 10.7.  (*See* IRO at 31; Pl's MoL at 15-16).   Nonetheless, the same *Turner* analysis generally applies to individualized decisions implicating First Amendment violations.  *See cf. Ford v. McGinnis*, 352 F.3d 582, 595 n.15 (2d Cir. 2003) (citation omitted) ("Although *Turner* . . .  concerned the reasonableness of prison regulations, we have previously suggested that the analysis is the same as to an individual decision

---

[24] To the extent that the plaintiff's argument could be construed as lodging a facial attack on the governing regulation, A.D. 10.7, the Second Circuit has recently held that it passes constitutional muster.  *See Reynolds v. Quiros*, 25 F.4th 72, 95 (2d Cir.) ("A.D. 10.7 satisfies the reasonableness test set forth in the *Turner* factors and does not violate plaintiffs' First Amendment rights."), *cert. denied*, 214 L. Ed. 2d 67, 143 S. Ct. 199 (2022).

to deny a prisoner the ability to engage in some requested religious practice"); *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (citing *Ford*, 352 F.3d at 595 n. 15) ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise."); *Holland v. City of New York*, 197 F. Supp. 3d 529, 539 (S.D.N.Y. 2016) (citing *Ford*, 352 F.3d at 595 n. 15 and *Salhuddin*, 467 F.3d at 274) ("Thus, regardless of whether Holland's rights were violated pursuant to an individual decision or a prison rule, regulation or policy, the inquiry is the same" and *Turner* applies).

As relevant here, the Second Circuit has recently instructed that, in certain discrete "single incident" scenarios, some *Turner* factors may be more or less relevant or entirely inapplicable in examining the reasonableness of a prison official's decision implicating First Amendment curtailment.   In *Burns*, the Second Circuit faced a First Amendment challenge regarding an incarcerated person's right to freedom of speech or to refrain from speaking in the context of "snitching," *i.e.*, being a prison informant.  *See* 890 F.3d at 88-89.  In this context, for example, the Circuit opined that the second *Turner* factor -- which "questions about alternative means of expressing the right" -- was "ill-fitting in a single incident case."  *Id.* at 87.  Keeping these instructions in mind, the Court turns to the *Turner* factors as applicable to the plaintiff's claim.

The Second Circuit has stated that the first *Turner* factor – whether the action is reasonably related to legitimate penological interests – "is undoubtedly relevant to a single-incident case[.]" *Burns*, 890 F.3d at 87.   Further, it is well settled that "conduct expressly aimed at protecting prison security is 'legitimate' beyond question and is in fact 'central to all other correctional goals.'" *Shakur*, 391 F.3d at 113 (quoting *Thornburgh*, 490 U.S. at 415).  In *Burns*, the Circuit reminded trial courts that they should "take care to emphasize the heightened role of security interests in the prison context."  *Burns*, 890 F.3d at 87.

The evidence adduced by the defendants shows that the book was initially rejected at Lusmat's facility due to "it containing material associated with Security Risk Groups." (Kunkel Decl. ¶ 5). After review by Kunkel, Papoosha, and the MRB, the rejection was upheld because the book "depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption and/or encourages or instructs in the commission of criminal activity." (*Id.* at ¶ 10). This identical language is found in A.D. 10.7. *See id.* at (N)(1)(e).

Lusmat argues that the book simply concerned Black history in the context of the Black P. Stone Nation and was not gang related, or at least not related to the Bloods gang specifically. (Pl's MoL at 15-16). Lusmat further presses that it "seems . . . like [] Whites have access to books from White Nationalists and Nazis and many more without problems but the colored have to litigate or appeal majority of the books with our history as a people." As to the first contention, it is true that in Papoosha's own words, the book was "just the historical breakdown of the Black P. Stones." (Doc. No. 105-16 at 1). Thus, there appears to be no factual dispute regarding the substance of the book. As it happens, the Court does not have the book before it as evidence.[25]   However, the Court need not review the contents of the book itself to resolve the issue of whether its rejection was proper because, in this context, the Court "must distinguish between evidence of disputed facts and disputed matters of *professional judgment*." *Beard v. Banks*, 548 U.S. 521, 529–30, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006) (emphasis added). "In respect to the latter, our inferences must accord deference to the views of prison authorities." *Id.* And when the issue "concern[s] the entry of materials into the prison, we agree . . . a regulation which gives prison

---

[25]While the defendants briefing indicated they would obtain and forward a copy of the book, they have not done so. (*See* Defs' MoL at 19 n.5). In any case, the book is widely available for sale to the general public. *See* The Almighty Black P Stone Nation: The Rise, Fall, and Resurgence of an American Gang: Moore, Natalie Y., Williams, Lance: 9781613744918: Amazon.com: Books.

authorities broad discretion is appropriate." *Reynolds v. Quiros*, 25 F.4th 72, 99 (2d Cir.), *cert. denied*, 214 L. Ed. 2d 67, 143 S. Ct. 199 (2022) (quoting *Thornburgh,* 490 U.S. at 416).

The Court recognizes "that at this stage we must draw 'all justifiable inferences' in the plaintiff's favor." *Beard*, 548 U.S. at 529–30 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). But "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.* Here, the evidence shows that MRB's concern stemmed from the fact that the book had already previously been subject to review in 2013, that the Black P. Stones were "recognized in CT as being an offshoot of the SRG Bloods" and that the Black P. Stones had been upgraded from being on the "Disruptive list" to a discrete Security Risk Group "due to their Blood ties" in 2018.   (Doc. No 105-16 at 2; Kunkel Decl. ¶¶ 6, 9-10).  Further, Papoosha's email to Kunkel elucidates that:

> A lot of our Stones in CT have lineage or claim to be Black P. Stones but they are actually full fledged Blood Sets. We have a bunch of Jungle Stone Bloods or JSB who are claiming to be P. Stone but we have found paperwork in their possession where they openly rep Blood.

> (Doc. No 105-16 at 1).

This evidence generally supports the defendant's contention that "the publication was rejected because it depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption and/or encourages or instructs in the commission of criminal activity." (Kunkel Decl. ¶ 10).  As the Second Circuit has previously held, "[i]t is rational [for prison officials] to censor any materials found to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." *Reynolds*, 25 F.4th at 86 (quoting *Shakur v. Selsky*, 391 F.3d 106, 114 (2d Cir. 2004)) (internal quotation marks omitted).  Ultimately, "the question under the *Turner* test is not whether such violence is common or likely, but rather whether

it was rational for DOC to believe that at least some violence in the prison facility could be prevented through the regulation." *Id.* at 88.  "[P]rison officials must be given latitude to anticipate the probable consequences of certain speech, and must be allowed to take reasonable steps to forestall violence." *Burns*, 890 F.3d at 87 (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1055 (2d Cir. 1995)) (internal quotation marks omitted).  This evidence points to such a rationale here, and, even drawing all inferences in his favor, the plaintiff has not provided any more than conclusory arguments of a general purported practice of allowing White Nationalist and Nazi material into his facility to rebut it.  Of course, if the plaintiff could adduce evidence creating an issue of fact as to whether Papoosha's judgment in rejecting the book was informed by "personal prejudices," such a claim might be cognizable on the ground that A.D. 10.7 was not being applied neutrally in his case.  *See Shakur v. Selsky,* 391 F.3d 106, 114 (2d Cir. 2004) (Where "regulations fairly invite[ ] prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner censorship," they are "decidedly not 'neutral' in the relevant sense" and may infringe on First Amendment rights) (quoting *Thornburgh*, 490 U.S. 401, 416 n.16)).  But this is not the case here.  The first *Turner* factor favors the defendant.

As to the second *Turner* factor – whether "there are alternative means of exercising the right that remain open to prison inmates" – this also tips in the defendant's favor.  *Turner*, 482 U.S. at 90. The Supreme Court has instructed that "'the right' in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at, 417.  Here, there is no evidence in the record that the plaintiff is otherwise barred from receiving MRB-vetted publications from the outside generally, or publications about Black history or the Black P. Stone Nation more specifically.  It would contravene precedent to draw the plaintiff's First Amendment right to receive information so narrowly such that access to the book was the only avenue available to the plaintiff to receive

information about either subject. *See Reynolds*, 25 F.4th at 92 ("Accordingly, we decline to accept the formulation of the right as proposed by plaintiffs and, instead, agree with the district court's adoption of the broader right[.]").  Thus, the second *Turner* factor also weighs in favor of the defendants.

As to the third *Turner* factor – evaluating "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" – the Court finds that it also ultimately favors the defendant.  *Turner*, 482 U.S. at 90. *See Burns*, 890 F.3d at 88-89.   It may be the case that allowing Lusmat access to the book may cause an unspecified and "significant ripple effect" on fellow inmates and staff in terms of safety or extra work for prison staff.  *Turner*, 482 U.S. at 90 (internal quotation marks omitted).  As the defendants have not adequately briefed the issue nor adduced evidence of how accommodation of such books to Lusmat individually would impact the safety or work allocation in the wider prison system, the Court is left with a paltry record from which to review.  *But see Reynolds*, 25 F.4th at 93 (affirming on the issue after the lower court had conducted an "extensive" bench trial). Nonetheless, the Second Circuit has noted that the third *Turner* factor can be considered "in part a restatement of the deferential balancing called for under the first factor."  *Id.* (quoting *Amatel v. Reno*, 156 F.3d 192, 201 (D.C. Cir. 1998)) (internal quotation marks omitted).   With this explanation, the MRB's decision to reject the book, given their conclusion that the subject matter "depict[ed], describe[d], or encourage[d] activities which may lead to the use of physical violence or group disruption," was reasonable as it was documented that its subject matter involved a subset of a Blood gang that had also been identified in the prison and had been upgraded to SRG status. (Kunkel Decl. ¶ 10).  The third *Turner* factor also slightly tips in the defendants' favor.

As to the fourth *Turner* factor, it also weighs in the defendants' favor. This factor asks whether there exist "ready alternatives" in prison policy such that the policy reveals and unreasonable or "an exaggerated response to prison concerns." *See Burns*, 890 F.3d at 88 (citing *Turner*, 482 U.S. at 87) (finding this factor "relevant to a single incident case"). While "review of actions taken by prison officials is 'deferential,' . . . a single incident [still may] plainly constitute an outsize reaction to prison administration concerns." *Id.* (quoting *Ford v. McGinnis*, 352 F.3d 582, 595 (2d Cir. 2003)). As discussed above, the facts indicate that the defendant and the MRB were acting towards a legitimate safety concern about the book and its subject matter being potentially tied to Blood gang members inside the prison who are affiliated as P. Stones Bloods. The plaintiff has failed to produce any evidence that this decision was an "exaggerated response." The fourth *Turner* factor also favors the defendants.

Given the foregoing analysis, the Court finds under the deferential *Turner* standard that, while defendant Papoosha was involved in the decision to deny Lusmat access to the book, this decision did not unreasonably infringe upon his First Amendment rights and Lusmat has failed to adduce facts creating a genuine dispute as to this issue. *Turner*, 482 U.S. at 87. Accordingly, the Court **GRANTS** summary judgment and **DISMISSES with prejudice** the First Amendment claim against defendant Papoosha.

### 3.    Deliberate Indifference Regarding the Inmate Fight

The IRO also permitted the plaintiff to pursue a claim based on deliberate indifference under the Fourteenth Amendment against defendants Salius, Hermanowski, and Baez in connection with a physical altercation between the plaintiff and another inmate on February 14, 2020, during a transfer from SRG Phase One at Northern to SRG Phase Two at MWCI. (IRO at 17-20). The gravamen of the plaintiff's claim is that the defendants, who were staffed at MWCI,

were deliberately indifferent to his health and safety when they knowingly released him, a member of the Bishop Bloods "set,"[26] into the cell of Williams, who was a member of an opposing Blood gang "set," which precipitated an assault on him.  (*Id.*).  The plaintiff frames this as a deliberate indifference claim predicated on a failure to intervene prior to the attack.  (*See* Pl's MoL at 13, 15).  *See Rosen v. City of New York*, 667 F. Supp. 2d 355, 360 (S.D.N.Y. 2009) ("An officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene.").

As a pretrial detainee, Lusmat's deliberate indifference claim is "governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment."  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  To prevail on a claim of deliberate indifference, a pre-trial detainee must satisfy two showings: (1) an objective prong "showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process," and (2) "a '*mens rea* prong' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions."  *Id.*  "In other words, [Lusmnat] must show that the officers were deliberately indifferent to the risk posed to [Lusmat]."  *Ungar v. City of New York*, No. 21-1384-CV, 2022 WL 10219749, at *1 (2d Cir. Oct. 18, 2022).

For the reasons discussed below, the Court finds that there are a genuine disputes of material facts as to both prongs and accordingly **DENIES** the defendants' motion for summary judgment on this claim.

---

[26] A "set" is akin to a sub-group or subsidiary affiliation within the main umbrella of an established gang, such as the Bloods.  *See, e.g.*, *United States v. Cornelius*, 696 F.3d 1307, 1314 (10th Cir. 2012) ("The Wichita Crips are composed of several 'sets,' or sub-gang units, each of which may have their own subsets. Testimony at Cornelius's trial indicated that Cornelius was considered an 'OG,' or 'original gangster,' within one of the sets.").

a)       **Factual Background**

The documentary evidence and prison-recorded video of the incident establishes the following facts, which are undisputed unless otherwise noted.

On February 14, 2020, Lusmat and Williams were transferred from Northern to MWCI. (Doc. No. 105-14 at 8).  Captain Salius supervised the transfer. (Def. 56(a)1 ¶ 15; Pl 56(a)2 ¶ 15; Doc .No. 105-14 at 8; Salius Decl. ¶ 4).  The fight itself occurred in a hallway in the Admitting and Processing area ("A&P") at the Walker Building at MWCI at approximately 12:27 PM. (Salius Decl. ¶ 5; Doc. No. 105-14 at 2).  As explained in the declaration of another inmate, Felix Vasquez, who was part of the same transfer as Lusmat, when inmates are being transferred from a more restrictive phase of SRG, they are first placed individually in separate cells next to each other for processing.  (Doc. No. 113-21 at 1) ("Vasquez Decl.") (*See* Salius Decl. ¶ 11).  Inmates in Phase 2 of SRG are given green jumpsuits to wear.  (Vasquez Decl. at 1).

As some point before the fight, Salius putatively asked whether Lusmat and Williams "were good with the process" and, in this instance, neither "expressed they were uncomfortable with the intake process" and "did not give any indication that they may pose a problem or a risk to any other inmate or staff."  (Salius Decl. ¶¶ 9-10).  However, later, Salius asked Vasquez and another inmate whether they "also were going to the fight" and said that "[the DOC officers] had to make it look good for the camera because some inmates like to sue."  (Vasquez Decl. at 2). Salius disputes these allegations, saying that "MCWI Staff," presumably including himself, "had no idea, or reason to believe, that the two inmates would engage in physical conflict.  (Salius Decl. ¶ 13).

Hermanowski also came to Lusmat's holding cell prior to the fight and told him "this should be good" and that he and Baez believed Lusmat was considered the "underdog" in the

upcoming fight; Hermanowski even told Lusmat he had won money betting on him.  (*See* Am.

Compl. ¶¶ 42-44; Pl's MoL at 13-14 ("[Hermanowski] and Baez were joking about a bet that was

made between multiple officers about who win this fight")).  Lusmat states that he "repeatedly told

[these] officers they set me up and [Hermanowski and Baez] responded it wasn't them" and that it

"came from higher ups in Central Office."  (Am. Compl. ¶ 44).  Vasquez's declaration supports

this account. Vasquez declares that he "saw Hermanowski walk over to the cell which inmate

Lusmat was in and overheard" Hermanoski say "[Williams] is in there shadow boxing are you

ready?"  (Vasquez Decl. at 2).  Vasquez also reports hearing that, after the fight, Hermanowski

told Lusmat, "[Y]ou just won me some money, I took the underdog."[27]  Conspicuously, the

defendants have not put forth any declarations from either of Hermanowski or Baez disputing this

account.[28]

Additionally, footage from three different security cameras that captured the incident show

the following.[29]  The plaintiff, wearing a green jumpsuit and a white long-sleeved shirt is escorted

out of his individual cell and to another room around the corner. (A&P Room 19:36-19:47; Bullpen

19:36-19:47; Hallway 19:43-21:37).  The plaintiff remains in this room for about two minutes

---

[27] The defendants maintain that these statements are inadmissible hearsay which cannot defeat summary judgment. (Defs' Reply at 9).  The defendants forget that Hermanowski, like Salius, is a party opponent in this case and thus his statements are not considered hearsay pursuant to FED. R. EVID. 801(d)(2)(A) and may be admissible at trial and therefore considered at summary judgment.

[28] Fed. R. Civ. P. 56(e)(2) allows the court to consider a "fact undisputed for purposes of the motion" where a "party . . . fails to properly address another party's assertion of fact as required by Rule 56(c)."  Moreover, the supplemental incident report from Baez has been entirely redacted by the defendants, (*See* Doc. No. 105-14 at 12), and Hermanowski's is devoid of any information regarding events occurring prior to the fight.  (*Id.* at 13).

[29] The defendants have submitted to the Court and the plaintiff three videos taken from three different stationary security cameras in the A&P area.  (*See* Doc. No. 118).  The videos are fifty-five minutes long, and all track the same period of time; each shows the fight occurring at approximately 27 minutes and 25 seconds from the start of the video. The Court refers to the videos by the relevant vantage point they capture and the relevant minute-second timestamp. "A&P Room" corresponds to the video file titled "Walk-Vp-20-067 - Export Wci-505 Ap Hallway - Looking Ip14 From Ip01 Friday 2-14-2020-1."  "Hallway" corresponds to the video file titled "Walk-Vp-20-067 - Export Wci-506 Ap Hallway - Looking Ip13 From Ip27 Friday 2-14-2020-1."  "Bullpen" corresponds to the video file titled "Walk-Vp-20-067 - Export Wci-557 Holding Cell - Ip14 Friday 2-14-2020-1."

while three to five corrections officers mill outside.  (Hallway 19:43-21:37).  The plaintiff is then escorted back to his original holding cell.  (A&P Room 21:40-21:43).

The same process is carried out with inmate Williams whose arms are not covered by a shirt and are bare; Williams is escorted out of his holding cell (which is next to Lusmat's) and to another room and is returned to his original cell some minutes later.  (A&P Room 21:45-26:23; Hallway 21:44-21:47, 26:21-26:24; Bullpen 26:24-26:38).  While escorting Williams back in his cell, two officers exchange a "fist bump."  (Bullpen 26:14-26:16).  Approximately forty seconds after being placed back in his cell, a CO opens the door to Williams's cell and places in him in what Vasquez describes as the "bullpen," which is a larger holding cell immediately adjacent the individual holding cells; the bullpen has windows and benches and, importantly, has no door or bars, thus allowing someone to move in between the bullpen and the hallway outside of the individual cells.  (A&P 27:00-27:12; Vasquez Decl. at 2).  Williams, uncuffed, then paces in and out of the doorway of the bullpen while two officers ostensibly watch him (though one may be on his phone); another officer goes to the plaintiff's cell, opens the door to the cell, lets the plaintiff out and walks *behind* the plaintiff. (Bullpen 27:12-27:24; A&P 27:19-27:25).  The plaintiff keeps his uncuffed arms behind his back.  (*Id.*).

Just as the plaintiff reaches the doorway of the bullpen a few feet away, Williams lunges out of the bullpen with his arm and closed fist extended and appears to connect with the plaintiff and swings multiple times.  (A&P Room 27:25-27:41; Bullpen 27:25-27:41).  Another camera shows at least seven to eight officers crowding and milling about the hallway the minute prior to the fight.  (Hallway 26:00-27:40).  After the first swing, corrections officers immediately intervene and flood the hallway, and the plaintiff is then separated and restrained on the ground.  (A&P Room 27:25-27:41; Bullpen 27:25-27:41; Doc. No. 105-14 at 3).  The prison medical staff reported

"minored bruising and scratches," yet most of the actual medical incident report is redacted. (Doc. No. 105-15 at 19-22).  Handheld video[30] taken after the fight captures Williams yelling "On sight, bro! That's it!"  (Handheld Video 00:12-00:12).

### b)    Objective Prong – Substantial Risk to Safety

Pretrial detainees "may not be deprived of their basic human needs" such as "reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health."  *Darnell*, 849 F.3d at 30.  The Second Circuit has been clear that corrections officers "must take reasonable measures to guarantee the safety of the inmates, including by protecting 'prisoners from violence at the hands of other prisoners[.]'"  *Ungar v. City of New York*, No. 21-1384-CV, 2022 WL 10219749, at *1 (2d Cir. Oct. 18, 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (citation and internal quotation marks omitted).  Here, the risk posed – and in fact inflicted – was the risk of physical violence at the hands of a fellow inmate from a rival, antagonistic gang set.  *See, e.g.*, *Greene v. Garcia*, No. 12 CV 4022 LAP MHD, 2013 WL 1455029, at *6 (S.D.N.Y. Mar. 26, 2013) ("This argument misconstrues the source of Plaintiff's alleged concerns. The Complaint asserts that Plaintiff faced a substantial risk of harm because he was simultaneously: (1) designated S.R.G. Bloods; and (2) housed in a Crips housing area.").

While the defendants suggest that the plaintiff's claims should be dismissed on the grounds that the fight was a "surprise" and that Lusmat's suffered injuries were not sufficiently "serious," this argument misunderstands the law.  (Defs' MoL at 16).  To be sure, "[n]ot every injury that a prisoner suffers at the hands of another results in constitutional liability for the officials responsible for that prisoner's safety."  *Taylor v. City of New York,* No. 16 CIV. 7857 (NRB), 2018 WL

---

[30] The "Handheld Video" file is entitled "Walk-Vp-20-066 - 00012-1."

1737626, at *11 (S.D.N.Y. Mar. 27, 2018) (quoting *Farmer*, 511 U.S. at 834).   However, the relevant question for the objective prong inquiry is whether there was, objectively, a "sufficiently *substantial risk* of serious damage to [the plaintiff inmate's] *future* health."  *Farmer*, 511 U.S. at 843 (emphasis added).  *See Randle v. Alexander*, 960 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) (The "focus of [the objective prong] inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.'") (citation omitted). As to this inquiry, the defendants cannot show that no jury would find that there was no objective risk of harm.

First, as a general proposition, courts in this Circuit "have repeatedly recognized [that] gang-affiliated inmates may face a substantial risk of harm when they are housed in areas controlled by rival gangs."  *Thawney v. City of New York*, No. 17 CIV. 1881 (PAE), 2018 WL 4935844, at *4 (S.D.N.Y. Oct. 11, 2018) (collecting cases).  This holds true even where the inmate in question does not have "any prior history with the specific inmate[] who attacked him . . . ." *See Plunkett v. City of New York*, No. 10-CV-6778 CM, 2011 WL 4000985, at *5 (S.D.N.Y. Sept. 2, 2011) (McMahon, J.) ("The only evidence in the record at this point establishes that a Crip is in danger from any Blood (and that DOC runs its facilities, at least on paper, in a manner that acknowledges the fact), a particular Crip's lack of prior experience with a particular Blood does not render plaintiff's Eighth Amendment claim defective as a matter of law."); *Greene*, 2013 WL 1455029, at *6 ("Defendants' position that Plaintiff was not injured in the altercation, that Plaintiff happened to escape injury when the attack that he feared ultimately occurred does not undermine the Complaint's allegations that, due to the history of extreme violence between Bloods and Crips within the GRVC, Defendants' actions placed Plaintiff in a position of great personal risk.").

Second, Connecticut DOC's own regulations themselves offer evidence that the defendants put the plaintiff in a situation which posed an objectively substantial risk of serious future harm. The DOC has promulgated an Administrative Directive, A.D. 6.14, which provides specific instructions and policies to "identify, monitor and manage" inmates identified as and designated to, *inter alia*, SRG groups, such as SRG Bloods "sets." A.D. 6.14 at ¶ 1. (*See* Doc. No. 105-16 at 1) (defendant Papoosha's letter describing specific "full fledged Blood sets" within the prison and their upgrade to SRG status). Moreover, A.D. 6.14 explicitly recognizes and differentiates between SRG-designated inmates and the rest of the prison population (including other worrisome but less dangerous prison groups) on the grounds that SRG-designated inmates are a unique "group of inmates . . . which as a discrete entity, jeopardizes the *safety* of," *inter alia* "other inmate(s) and/or the security and order of the facility." A.D. 6.14 ¶ 3(H) (emphasis added). As a result, A.D. 6.14(22) specifically prohibits an SRG member from being "placed in any holding area with inmates that are not of the same classification" for any "outside movement." *Id*. This ostensibly covers a transfer from Northern to MWCI. Thus, the DOC's own regulations contemplate that an objectively serious risk of harm could occur if two inmates from different gang "sets" are placed in physical proximity to each other, as courts in this Circuit have repeatedly found. *See, e.g.*, *Thawney*, 2018 WL 4935844, at *4.

What is more, the evidence produced by the defendants themselves confirm that both Lusmat and Williams were known to be from two "differing sets of SRG [Bloods]" and that "these two sets have been at odds with each other, in regards to a conflict over an attempt to organize and form a union of the various [Blood] sets."[31]  (Doc. No. 105-14) (Salius's Critical Incident Brief).

---

[31] While the word "Blood" is redacted in the documents and reports produced by the parties, the defendants own statement of facts admits that this is indeed the SRG gang that the plaintiff was designated to. See Def's 56(a)1 ¶ 21; Salius Decl. ¶ 13.

In fact, an after-incident report explicitly "noted that earlier during the shift a spate altercation occurred in the B2 unit between members of these same sets." (*Id.*). (*See* Salius Decl. ¶ 13 (Salius conceding that Lusmat and Williams belonged to different SRG Blood sets "which possibly resulted in" the fight); (Doc. No. 105-14 at 2) (Shift Commander Overview and Notification Sheet stating "[t]he fight appears to be a result of inmates Lusmat and [Williams] who are both designated SRG members of the [Bloods] SRG being of opposing 'Sets.'").  Additionally, the defendants' handheld video evidence captures Williams yelling "On sight, Bro!" which other Courts have noted generally implicates a directive to a gang or set member to physically assault a rival "on sight."  *See Cabral v. Strada*, No. 12-CV-3945 JS, 2012 WL 5507458, at *1 (E.D.N.Y. Nov. 14, 2012), *aff'd*, 513 F. App'x 99 (2d Cir. 2013) ("There are indications that a gang directive honored by both the Bloods and the Latin Kings has been issued to physically assault Petitioners on sight.");  *United States v. Felipe*, 148 F.3d 101, 112 (2d Cir. 1998) ("Andino confirmed that a termination-on-sight order had been issued by defendant Felipe against Navaez and directed another Latin King to murder Navaez at a location where she knew he would be.");  *Mitchell v. Chavez*, No. 113CV01324DADEPGPC, 2016 WL 3906956, at *1 (E.D. Cal. July 19, 2016), *report and recommendation adopted*, No. 113CV01324DADEPGPC, 2016 WL 4897945 (E.D. Cal. Sept. 14, 2016) ("two of the 2-5 gang members that attacked him on the yard were housed in the ASU, and they were telling the other gang members to kill Plaintiff on sight.").

Given this evidence, a reasonable jury could find that, by allowing an SRG inmate of one set to occupy the same open space with another SRG inmate from a different set which is in open and antagonistic conflict with the other (and is on "on sight" status), the defendants objectively created a substantial risk of harm.  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (The "evidence is such that a reasonable jury could return a verdict for the

nonmoving party.") (citation omitted).  Accordingly, summary judgment is **DENIED** as to the objective prong of Lusmat's deliberate indifference claim.  *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense — *or the part of each claim or defense* — on which summary judgment is sought.") (emphasis added).  .

c)      ***Mens Rea* Prong**

The Court also finds that genuine disputes of material fact exist as to the *mens rea* prong which likewise precludes granting the defendants summary judgement.  *See Darnell*, 849 F.3d at 35.

According to Lusmat, defendants Salius, Hermanoski, and Baez all knew ahead of time that they anticipated a fight to break out between Lusmat and Williams – two antagonistic Bloods – and intentionally set up the transfer in a way that would allow them to fight.  (*See* Compl. ¶¶ 42-44; Pl's MoL at 13-14).  This is generally corroborated by the declaration of at least one other inmate, Vasquez.  (*See generally* Vasquez Decl.).  Of course, Salius (the only defendant to file a declaration in this case) disputes this version of facts and instead maintains that he believed that no such issues would arise because he generally asked the inmates if they "were good with the process," and neither Lusmat nor Williams "expressed they were uncomfortable with the intake process" and "did not give any indication that they may pose a problem or a risk to any other inmate or staff."  (*See* Salius Decl. ¶¶ 9-10).   This account is undercut by Lusmat's report in his memorandum that he was never actually asked this question by Salius despite knowing Salius for a long period of time given his incarceration history.  (Pl's MoL at 13).  Further, Salius's own declaration does not explicitly state that he specifically asked Lusmat (or Williams) if he was comfortable with the transfer.  (*See* Salius Decl. ¶¶ 9-10).  Moreover, Lusmat alleges that, after he repeatedly told officers that this transfer was "set up," they did not do anything except tell him that

the transfer decision came from "higher ups in Central office."  (Am. Compl. ¶ 44).  On these facts, a jury could certainly find that the defendants acted with knowing and intentional indifference to a serious risk of harm.  *See Darnell*, 849 F.3d at 36 ("A detainee must prove that an official acted intentionally or recklessly, and not merely negligently").

Even accepting *arguendo* that the defendants did not act intentionally, however, disputed factual issues would still remain as to whether the defendants "should have known" that Lusmat and Williams should not have been transferred together and whether they "recklessly failed to act with reasonable care to mitigate the risk that the condition posed," *i.e.*, an inmate-on-inmate fight. *Id.* at 35.  *See Thawney*, 2018 WL 4935844, at *4 ("It is well established that an officer acts with deliberate indifference if he is aware of an attack, has an opportunity to protect the inmate, and does not intervene.").  The defendants maintain that "MWCI staff did not have any information about either inmate's SRG affiliation or 'set' prior to the inmates' transfer to MWCI," and that the defendants only learned *after* the fight that Lusmat and Williams were from different antagonistic gang sets.  (Salius Decl. ¶ 13).  However, the defendants' own evidence indicates this may not have been the case.  Indeed, Salius himself signed an incident report after the fight stating that, "based upon *known* intelligence and knowledge of the inmates, they are from differing sets of the SRG [Bloods]" who were at "odds" and whose sets had already been involved in an "altercation" just earlier that day.  (Doc. No. 105-14 at 8, 10 (emphasis added); Pl's 56(a)2 ¶ 21).  Thus, there is an open dispute as to *when* exactly Salius found out this information and, if he did know prior to the transfer, whether allowing the transfer to proceed as it did amounts to a reckless or deliberately indifferent failure to act to mitigate a known risk.[32]  These disputed factual questions must be resolved by a jury and not the Court.

---

[32] The Court notes that other DOC documentation, specifically A.D. 9.3, raises an inference – drawn in favor of Lusmat – that Salius should have known about Lusmat's and William's SRG designations *prior* to the transfer.  A.D. 9.3(5)(C)

For these reasons, summary judgment is also **DENIED** as to the *mens rea* prong of Lusmat's deliberate indifference claim.

### C.      Qualified Immunity

Notwithstanding any genuine issue of triable fact, the defendants maintain that they are entitled to qualified immunity on all of the plaintiff's claims.  Here, the only claim remaining for trial is the deliberate indifference to safety claim against defendants Salius, Hermanowski, and Baez related to the fight between Lusmat and Williams.  However, the defendants' briefing does not contain any substantive argument regarding this claim; the defendants merely state that, "in regard to the use of force claim, Defendant [Hermanoski] simply discharged his usual duties as a correctional official."  (Doc. No. 105-1 at 22).  The defendants decline to elucidate any further analysis or address at all the purported conduct of defendant Salius or Baez.  Nonetheless, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009)

"Qualified immunity is an immunity from suit rather than a mere defense to liability."  *Id.* at 237 (citation and internal quotation marks omitted).  "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'"  *Id.* at 244 (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).  "A Government official's conduct violates clearly established law when, at

---

governs "authorized transfers" of inmates and states: "A copy of CN 9307, Inmate Overview Sheet shall be presented to the receiving facility *prior to an inmate being admitted to the facility* on a transfer."  *Id.* (emphasis added).  Here, that would presumably mean MWCI, as the receiving facility, and Salius who admittedly oversaw the transfer would have been presented with a copy of CN 9307.  Lusmat's CN 9307 indicates a redacted SRG entry and other redactions under "Special Management" and "Violence History."   (Doc. No. 105-14 at 42).  While neither party submitted a copy of this Administrative Directive as evidence, "[t]he Court can take judicial notice of the State of Connecticut Administrative Directives that are found on the [DOC] website."  *Paschal-Barros v. Kenny*, No. 3:18-CV-1870 (VLB), 2019 WL 2720739, at *4 (D. Conn. June 28, 2019).

the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation marks and brackets omitted). *Accord McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016). "Although we generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right, the absence of a decision by this Court or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (citation omitted).

Here, Lusmat's constitutional claims arise under the Fourteenth Amendment's clearly established guarantee that pretrial detainees shall be being free of "punishment" of "any manner—neither cruelly and unusually nor otherwise." *Darnell*, 849 F.3d at 29 (citation and quotation mark omitted); *Benjamin*, 264 F.3d at 188.   The plaintiff has alleged that the defendants have violated his clearly established constitutional right to be free from punishment by acting with deliberate indifference to a substantial risk to his health and safety.  *See Farmer*, 511 U.S. at 843. The defendants nonetheless contend that their conduct did not violate clearly established law.  (Defs' MoL at 21).  But, "[t]here can be no doubt that inmates have a clearly established right to remain incarcerated in reasonably safe conditions."   *Randle v. Alexander*, 960 F. Supp. 2d 457, 479 (S.D.N.Y. 2013) (denying qualified immunity in the forced fight context).

"Of course, even where officers violate a clearly established constitutional right, they may nevertheless be entitled to qualified immunity if it was objectively reasonable to believe that their actions were lawful at the time of the challenged act.'"  *Id.* (quoting *Cerrone v. Brown*, 246 F.3d

194, 199 (2d Cir. 2001)) (cleaned up).  Here, the evidence shows that: (1) that Lusmat and Williams were from antagonistic Blood gang sets; (2) these sets were at odds and their members had even been in an altercation earlier in the shift; (3) DOC regulations prohibited members of differing SRG classifications to be "placed in any holding area" together when moving outside a facility per A.D. 6.14(22); (4) Salius, Hermanowski, and Baez were all involved in the transfer with Salius overseeing the transfer; (5) all three defendants made statements indicating that they believed that a fight between Lusmat and Williams would occur and at least Hermanowski and Baez made bets on the outcome; and (6) a fist fight indeed occurred.  *See generally* Part 3, *supra*.  On the facts presented, there can be no serious contention on the part of the defendants that it was objectively reasonable under governing law to release two inmates from rival gang "sets" into the same holding area, knowing that an assault would almost certainly occur.  *See Randle*, 960 F. Supp. 2d at 479 (finding "no serious contention" that it is "objectively reasonable to threaten inmates until they agree to fight each other in front of prison officials"); *Plunkett v.*, 2011 WL 4000985, at *7 ("Nor can it be said that any reasonable corrections officer could have thought it objectively reasonable to do what Caldwell is alleged to have done: (1) allow members of the Bloods to act as enforcers; (2) in a unit where a member of the rival Crips was housed; (3) and leave his post unmanned, in violation of DOC regulations, just as a group of Bloods entered a room where two members of the Crips were sitting alone.").  Accordingly, defendants Salius, Hermanowski, and Baez are not entitled to qualified immunity and summary judgment is **DENIED** on this issue.

### D.    Injunctive Relief

The plaintiff's Amended Complaint seeks the following injunctive relief:

I want the courts to order the defendants to stop using social media to affiliate inmates.  To give every newly admitted inmate a hearing before placing him in SRG or in a certain phase. To stop placing pretrial detainees in phase one or two of SRG or A/S. To give us program in every phase of SRG to rehabilitate us.  To stop

49

making us start the whole 2 years over for non-SRG related tickets. To stop housing
in inhumane conditions.

(Am. Compl. at 16).

The IRO did not address injunctive relief but did dismiss all claims for declaratory relief.
(IRO at 34).  The Court has dismissed the social media claim at the IRO stage and has now granted
summary judgment to the defendants on all the cognizable claims related to SRG placement.
Therefore, "in light of the above grant of summary judgment, the plaintiff's [prayer] for injunctive
relief is moot." *Tafari v. Weinstock*, No. 07CV0693, 2010 WL 3420424, at *9 (W.D.N.Y. Aug.
27, 2010).  *See Scozzari v. Santiago*, No. 3:19-CV-00229 (JAM), 2019 WL 1921858, at *6 (D.
Conn. Apr. 29, 2019) ("A request for prospective relief is only cognizable if an ongoing
constitutional violation is taking place[.]").  Moreover, courts should reject "remedial orders that
unnecessarily reach out to improve prison conditions other than those that violate the
Constitution." *Abernathy v. Comm'r of Correction*, No. 3:20-CV-628 (VAB), 2020 WL 5097566,
at *3 (D. Conn. Aug. 28, 2020).  *See* 18 U.S.C.A. § 3626 ("Prospective relief in any civil action
with respect to prison conditions shall extend no further than necessary to correct the violation of
the Federal right of a particular plaintiff or plaintiffs.").  Here, the plaintiff seeks to use his claims
to change certain prison policies, none of which he has proved to be unconstitutional in themselves.
Accordingly, the Court **DISMISSES** the plaintiff's demands for injunctive relief.

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS in part** and **DENIES in part** the
defendant's motion for summary judgment.

Specifically, the Court **GRANTS** summary judgment in favor of the defendants on the
following claims, which are **DISMISSED with prejudice**:

1) The unsanitary condition of confinement claim against defendant Medina in his individual capacity;

2) The denial of marriage claim against defendants Mudano and Chevalier in their individual capacities;

3) The procedural due process claim against defendants Papoosha and White in their individual capacities regarding the plaintiff's readmissions to SRG at Phase 1;

4) The procedural due process claim against defendants Tugie and Riccio in their individual capacities regarding June 2020 administrative segregation hearing; and

5) The First Amendment claim against defendants Papoosha, Laprey and White in their individual capacities regarding the denial of the book.

However, the Court **DENIES** summary judgment as to the deliberate indifference to safety claim against Salius, Hermanowski and Baez in their individual capacities and further finds that they are not entitled to qualified immunity at the summary judgment stage. Accordingly, this claim may proceed to trial. The parties shall schedule a conference to discuss a trial schedule within fourteen days of this Order and Ruling.

Dated at New Haven, this 28th day of June, 2023.

  /s/ Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge